[L.A. No. 30806. Oct. 13, 1978.]

THE STATE OF CALIFORNIA, Plaintiff and Respondent;
CITY OF SAN LUIS OBISPO, Plaintiff and Appellant, v.
SAN LUIS OBISPO SPORTSMAN'S ASSOCIATION et al.,
Defendants, Cross-complainants and Respondents;
STATE DEPARTMENT OF PUBLIC HEALTH et al.,
Cross-defendants and Respondents;
BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY
AND COLLEGES, Cross-defendant and Appellant;
WHALE ROCK COMMISSION, Cross-defendant, Cross-complainant
and Appellant.

442

COUNSEL

A. J. Shaw, Jr., City Attorney, for Plaintiff and Appellant.

Mayer Chapman and Robert J. Henry for Cross-defendant and Appellant.

William P. McWhinney for Cross-defendant, Cross-complainant and Appellant.

No appearance for Plaintiff and Respondent.

Andre, Morris & Racouillat, Michael J. Morris, Michael T. LeSage, Hart & LeSage, Jon M. Jenkins and Wright & Jenkins for Defendants, Cross-complainants and Respondents.

Evelle J. Younger, Attorney General, R. H. Connett, Assistant Attorney General, and Raymond H. Williamson, Deputy Attorney General, for Cross-defendants and Respondents.

OPINION

MANUEL, J.—The City of San Luis Obispo, the Trustees of the California State University and Colleges and the Whale Rock Commission appeal from a judgment directing the City of San Luis Obispo and the State of California, acting through the Whale Rock Commission, to provide adequate public access for fishing at Whale Rock Reservoir and to establish, operate and maintain a public recreational fishing program at the reservoir.[1]

The judgment represents the culmination of a lengthy process of negotiation and litigation directed toward determining whether the public has a right to fish at Whale Rock Reservoir and, if such right exists, the extent to which each of the respective parties bears a responsibility to finance a recreational fishing program at the reservoir.[2] For reasons set forth below, we conclude that the judgment must be affirmed.

The Whale Rock Reservoir was begun in 1957 under the authority of a special legislative enactment (Stats. 1957, ch. 1080, p. 2388). The state acquired the underlying land by purchase and by condemnation and constructed the reservoir jointly with the City of San Luis Obispo, which agreed to contribute 55 percent of the initial capital cost of the project. The purpose of constructing the reservoir was to impound and distribute water for domestic use, primarily to the City of San Luis Obispo, California State Polytechnic University and a nearby state prison. By further agreement, the state and the city established a joint-powers entity known as the Whale Rock Commission[3] to operate and maintain the reservoir.

In contemplation of this project the city, the university and the prison in 1956 filed applications with the State Water Rights Board for permits

[1]They were also ordered to plant fish at the reservoir, but no complaint is advanced concerning this obligation.

[2]The record reveals that the term "fishing program" refers to the designation of an area to be opened to fishing and the provision of sanitary facilities and surveillance to protect against contamination of the reservoir water, which is used for domestic consumption. As will be explained, these matters are required by health authorities in order to obtain the requisite permit from them authorizing public recreational fishing at the reservoir.

[3]The members of the commission include the state director of finance, the state director of education, the state director of corrections, the city mayor, the city administrative officer, and the city director of finance. (Nonvoting members are the state director of water resources and the city superintendent of water.)

to appropriate water from the reservoir. The Department of Fish and Game filed an objection to these applications in the interest of protecting the native fish. The department, however, withdrew its objections after an agreement (Fish and Game Agreement) was reached on October 21, 1957, between the city, the university, and the prison on one side, and the department on the other, regarding the preservation of fishlife at the reservoir.

The present proceeding was commenced in 1969 when the state and the city sought to enjoin trespassing or fishing at the reservoir to prevent possible contamination of the water, which is used for domestic consumption. In 1972, defendant San Luis Obispo Sportsman's Association cross-complained against the state, the city, the County of San Luis Obispo, the City of Morro Bay, the Whale Rock Commission and various state agencies, claiming a right to fish in the reservoir. Their cross-complaint was subsequently amended to claim that there was also a duty to fund an adequate public fishing program. After it became apparent that a properly supervised fishing program would not result in contamination of the water in the reservoir, the state altered its position by amending its answer to the cross-complaint to request an order from the court imposing liability for establishing a fishing program on the City of San Luis Obispo and the Whale Rock Commission. The Whale Rock Commission also filed a cross-complaint asking for declaratory relief to the effect that so long as the reservoir was not open to the public for fishing, unauthorized entry into the reservoir was without legal right.

After six years had passed, in the course of which the parties had unsuccessfully sought to reach a settlement, trial commenced in 1975. At trial the parties were aligned as follows: the Whale Rock Commission, the City of San Luis Obispo, the County of San Luis Obispo, the City of Morro Bay and the university trustees against the Sportsmen and all state agencies excepting the trustees. At the conclusion of the proceedings the court found that the public had a right to fish at the reservoir pursuant to the 1957 Fish and Game Agreement, article I, section 25 of the California Constitution, and section 5943 of the Fish and Game Code. The court further found that a properly regulated fishing program would not interfere with Whale Rock Reservoir's use as a domestic water supply, and that the public right to fish at the reservoir requires the city and the state acting through the Whale Rock Commission to fund such a program. The court apportioned the costs of a fishing program according

to the joint exercise of powers agreement between the state and the city, dated December 12, 1960, in which the costs of operation and maintenance of the reservoir were divided among the city, the state university and the state prison. Judgment was entered accordingly, and this appeal followed.

Appellants dispute the trial court's finding of a public right to fish pursuant to article I, section 25 of the California Constitution, section 5943 of the Fish and Game Code, and the Fish and Game Agreement.[4] They further dispute the trial court's conclusion that the public right to fish requires the city and the state, acting through the Whale Rock Commission, to provide an adequate fishing program at the reservoir. We proceed with an examination of the disputed public right to fish and duty to provide a fishing program.

PUBLIC RIGHT TO FISH

*Article I, Section 25*

Article I, section 25 of the California Constitution provides: "The people shall have the right to fish upon and from the public lands of the State and in the waters thereof, excepting upon lands set aside for fish hatcheries, and no land owned by the State shall ever be sold or transferred without reserving in the people the absolute right to fish thereupon; and no law shall ever be passed making it a crime for the people to enter upon the public lands within this State for the purpose of fishing in any water containing fish that have been planted therein by the State; provided, that the Legislature may by statute, provide for the season when and the conditions under which the different species of fish may be taken."

Although title to the lands surrounding Whale Rock Reservoir is vested in the state, appellants argue that this property is not "public lands" within the meaning of article I, section 25 because it is being used for a special governmental purpose, i.e., as a domestic water supply reservoir.

█ The words "public lands" must be interpreted to give effect to the intent of the voters in adopting this constitutional amendment. (*Kaiser* v.

[4]The city apparently does not join in the argument that there is no right to fish, but rather confines itself to the issue of financing a fishing program.

*Hopkins* (1936) 6 Cal.2d 537 [58 P.2d 1278].) Evidence of this intent may be found in the argument submitted to the voters in support of the amendment. (*Carter* v. *Com. on Qualifications, etc.* (1939) 14 Cal.2d 179 [93 P.2d 140].) The argument submitted to the voters in 1910 indicates that the amendment was aimed at protecting the public's right to fish upon and from state-owned land and to prevent the state from disposing of land without reserving that right.[5] Although the framers and electorate appear to have contemplated that this amendment would apply to property subsequently acquired by the state, it does not appear that they contemplated or intended that it would apply to state-owned lands which are used for a governmental purpose that is incompatible with use by the public for fishing. Illustrative uses are prisons and mental institutions. We do not, however, think that it was the intent of the framers and voters to exclude from the reach of this amendment all state-owned land acquired for *any* governmental purpose since all state acquisitions of land are in fact made for some state purpose. ■ Thus, we interpret the words "public lands" in article I, section 25 as meaning state-owned land the use of which by the state is also compatible with use by the public for purposes of fishing. Only property which is being used for a special purpose that is incompatible with its use by the public—for example, lands used for prisons or mental institutions—does not fall within the scope of this constitutional provision.[6]

---

[5]The ballot argument stated: "The inland streams and coast waters of the State of California abound in a great variety of fish, and aside from the sport of taking them, they furnish a very large portion of the state's free food supply. That the fish may not be exterminated and this great item of popular food depleted the people of the state are spending large sums annually for its protection and propagation.

"For many years the people of California have enjoyed the right to take fish from the waters of the state pretty generally, but since the vigorous development of California's natural resources by individuals and large corporations, many of the streams have been closed to the public and trespass notices warning the public not to fish are displayed to an alarming extent.

"The people are paying for the protection and propagation of the fish; for this reason if for no other they should have the right to take them. It is not fair that a few should enjoy the right to take the fish that all the people are paying to protect and propagate.

"To reserve the right to fish in a portion of the waters of the state at least, for the people, Assembly Constitutional Amendment No. 14 was introduced and adopted at the last session of the legislature of the State of California, and as an evidence of its popularity it was unanimously adopted by the assembly and by the senate with but two dissenting votes.

"If the people of the state vote favorably upon this proposed amendment to the constitution it will give them the right to fish upon and from the public lands of the state and in the waters thereof, and will prevent the state from disposing of any of the lands it now *owns* or what it may hereafter acquire without reserving in the people the right to fish."

[6]Appellants rely primarily on *In re Quinn* (1973) 35 Cal.App.3d 473 [110 Cal.Rptr. 881], for a more restrictive interpretation of the words "public lands." Although the court in

Use of a domestic water supply reservoir for public recreational fishing is not necessarily incompatible with its primary purpose since many domestic water supply reservoirs throughout the state provide public fishing programs without any health hazard to the users of the water. Although there may be domestic water supply reservoirs at which such use is incompatible with public fishing, ample evidence supports the trial court's finding in this case that a properly implemented public recreational fishing program at Whale Rock Reservoir would not interfere with its function as a domestic water supply reservoir. We therefore conclude that article I, section 25 applies to the state-owned lands surrounding Whale Rock Reservoir.

This conclusion, however, does not end our inquiry, for the right to fish under article I, section 25 is not an unqualified one. Respondents do not dispute that it must yield in appropriate factual situations to the reasonable exercise of the state's inherent police power to protect public safety and welfare. (*In re Quinn, supra,* 35 Cal.App.3d at p. 486.) Nor do respondents contest the need for regulation of fishing at the reservoir in order to insure against contamination of the water supplied from the reservoir for domestic consumption. Thus, although the public has a constitutional right to fish at Whale Rock Reservoir, this right is subject to reasonable regulation and could in fact be extinguished if public recreational fishing were to become incompatible with the reservoir's function as a domestic water supply source.

*Fish and Game Code Section 5943*

We begin our analysis of this provision by noting that section 5943 is one of a number of statutory provisions in the Fish and Game Code governing the damming of rivers and streams which are naturally frequented by fish. Such provisions include ones which impose affirmative duties on dam owners to take steps to preserve and protect the fish population. (See, e.g., Fish & G. Code, §§ 5931, 5933, 5938, 5942.) They

*Quinn* concluded that state-owned property used for the special governmental purpose of the California Aqueduct was not "public lands" within the meaning of article I, section 25, it also held that even if it were, entry thereon was nevertheless properly prohibited as a reasonable exercise of the state's police power because of the documented danger to the lives and safety of persons going in or near this man-made cement aqueduct.

To the extent that language in *Quinn* suggests a more restrictive interpretation of the words "public lands" than that given here, we disapprove it.

derive from the long-settled principle that the fish within the waters of the state are owned by the state in trust for the people and from the state's authority to regulate to protect and preserve this valuable public resource. (*People* v. *Stafford Packing Co.* (1924) 193 Cal. 719 [227 P. 485]; 53 Ops.Cal.Atty.Gen. 332 (1970).)

Section 5943 of the Fish and Game Code provides: "The owner of a dam shall accord to the public for the purpose of fishing, the right of access to the waters impounded by the dam during the open season for the taking of fish in such stream or river, subject to the regulations of the [Fish and Game] commission."

It is undisputed that Whale Rock Reservoir impounds the watercourse known as "Old Creek" and its tributaries, the waters of which were naturally frequented by migratory fish. Section 5943 is therefore applicable to Whale Rock Reservoir. Thus, the city and the state as statutorily defined owners of the reservoir (Fish & G. Code, § 5900, subd. (c)), acting through the Whale Rock Commission, have a duty under section 5943 to accord access to Whale Rock Reservoir for public recreational fishing.[7]

*Health and Safety Code Provisions*

Appellants have duties under the Health and Safety Code which must be considered in connection with the duty to accord access to the public for fishing. They have a duty to protect the purity of the water which is supplied from the reservoir to domestic users. (Health & Saf. Code, § 4035.) Before opening the reservoir to public fishing, they are required to determine that such fishing will not affect the purity and safety of the water for drinking and domestic purposes.[8] (Health & Saf. Code, § 4463.)

---

[7]We note that in connection with the duty to accord access for fishing, section 5944 of the Fish and Game Code provides that the owner "is not liable in damages to any person exercising the right to fish, who suffers any injury through coming in contact with, or tampering with, any of the property of the owner of the dam."

[8]The city and the university trustees suggest that these determinations have already been made by the Whale Rock Commission and that the scope of inquiry of the trial court should have been limited by section 1094.5 of the Code of Civil Procedure to a review of the transcript of the hearing conducted by the commission on the matter. Neither appellant raised this claim at any time during the proceeding before the trial court, and therefore we will not consider this argument now. Nevertheless, we observe in passing that the particular hearing in question was conducted by the commission during the course of litigation at the instigation of the trial court judge who was endeavoring to effect a settlement between the parties as to a mutually acceptable fishing program. None

They are also required to obtain a permit from the State Department of Health Services setting forth the terms and conditions upon which public fishing may be conducted. (*Ibid.*)

■ Appellants assert that they have a duty to prevent fishing at the reservoir because such fishing is proscribed by section 4464 of the Health and Safety Code. That section provides: "Public fishing shall not be conducted in a reservoir or on its surrounding land if the reservoir is used as a regulating reservoir to meet daily or peak consumption demands *and* as a terminal reservoir to a water collecting facility *and* as a distribution reservoir from which water may be supplied for drinking or domestic purposes without full purification treatment after withdrawal from the reservoir." (Italics added.)

Appellants would have us read this provision in the disjunctive, thereby substituting "or" for "and." However, it appears that the clear meaning of this statute is that fishing is prohibited when a reservoir is being used in all three capacities. The applicability of this statute was argued at trial, and the trial court impliedly found that Whale Rock Reservoir is not used in all of these capacities. After reviewing the record, we conclude that the trial court's implied finding must be upheld.

■ Appellants also assert that the provisions of section 5943 of the Fish and Game Code conflict with section 4462 of the Health and Safety Code, which provides that a public agency owning or operating a domestic water supply reservoir "may open to public fishing all or any part of the reservoir and its surrounding land." We see no express conflict between these provisions and thus no demonstrated legislative intent that the later-enacted Health and Safety Code provision should prevail over or impliedly repeal Fish and Game Code section 5943. (See *In re Thierry S.* (1977) 19 Cal.3d 727, 744 [139 Cal.Rptr. 708, 566 P.2d 610].) On the contrary, the statutes are compatible and congruous. Section 5943 requires that a reservoir which results from the damming of waters naturally frequented by fish be opened for fishing. Section 4462 makes it clear that an owner or operator of a domestic water supply reservoir has the power to open it to public fishing subject to the restrictions set forth in other provisions of the Health and Safety Code (e.g., §§ 4463, 4464). Although a conflict could arise between section 5943 and a domestic

of the parties considered this hearing by the commission as a final determination as contemplated by section 1094.5, subdivision (a) of the Code of Civil Procedure.

water supply reservoir owner's duties under the Health and Safety Code, the evidence here reveals no such conflict.

We note that the trial court found that a recreational fishing program operated in conformity with state and local regulations would not cause any known health hazard to the use of Whale Rock Reservoir as a source of domestic water supply. Testimony by state and local health officials indicated that fishing would be acceptable so long as it is confined to certain portions of the reservoir[9] and provision is made for adequate sanitary facilities and surveillance to insure against bodily contact with the water or any other form of contamination of the water. The testimony of the health officials was to the effect that the degree of access provided for fishing would determine the extent of sanitary facilities and surveillance deemed necessary for approval of fishing.[10]

Based on the foregoing, we conclude that the trial court properly found a public right to fish at Whale Rock Reservoir pursuant to article I, section 25 of the California Constitution and section 5943 of the Fish and Game Code. Although it is immaterial to the judgment, we pause briefly to note our disagreement with the trial court's interpretation of the Fish and Game Agreement as creating a public right to fish. Since no extrinsic evidence was introduced at trial with respect to the intent of the parties, we are not bound by the trial court's interpretation of the agreement.[11] (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].) We do not think that this agreement may reasonably be interpreted as creating more than a duty on the part of appellants to maintain the water pool in the reservoir in a certain manner consistent with the preservation of fishlife. We believe it apparent from

[9]Testimony by state and local health officials indicated that it would be unacceptable to allow fishing near the point of withdrawal of water from the reservoir.

[10]Appellants were required by Health and Safety Code section 4011 to obtain a permit from the State Department of Health (now State Department of Health Services) before furnishing water to users for domestic purposes. If, as here, the permit so obtained did not authorize recreational use of the reservoir, a permit amendment must be obtained before allowing such use. (Health & Saf. Code, §§ 4019, 4463; Cal. Admin. Code, tit. 17, §§ 7623-7630.)

[11]The agreement states in pertinent part: "WHEREAS, the City of San Luis Obispo, the California Men's Colony of the Department of Corrections, and the California State Polytechnic College of the Department of Education, hereinafter referred to as the Applicants, have filed Applications Nos. 17114, 17115 and 17116, respectively, with the State Water Rights Board to appropriate unappropriated water from Old Creek, San Luis Obispo County, for the Whale Rock Project which is to be jointly constructed and operated by the Applicants; and

both the general recitals and the specific provisions that the parties contemplated only the maintenance of a suitable habitat for fishlife at the time they entered into this agreement.

### DUTY TO PROVIDE FISHING PROGRAM

██ From the foregoing, it appears that appellants are under a duty to provide access to the public for fishing under article I, section 25 of the California Constitution and under section 5943 of the Fish and Game Code. They are also under a duty to protect the purity of the water supplied from the reservoir to domestic users. (Health & Saf. Code, §§ 4035, 4463.) Since a fishing program consisting of sanitary facilities and surveillance is necessary to fulfill these dual obligations, we think that the trial court properly concluded that appellants have a duty to

---

"WHEREAS, the California Department of Fish and Game has filed a protest to each of said applications in the interest of the protection, propagation and preservation of the fisheries and recreational resources afforded the People of this State in Old Creek; and

"WHEREAS, the California Department of Fish and Game has determined that, if the Applicants agree to maintain the pool in the proposed Whale Rock Reservoir, as hereinafter provided, for the habitation of fish life and related recreation, and if the Proposed condition herein agreed upon is inserted in the permits and licenses issued pursuant to the above identified applications, the interest of the People of this State in the fisheries and recreational resources involved will be adequately protected and the protest of the California Department of Fish and Game to the above identified applications may be considered withdrawn and may be disregarded; and

"WHEREAS, the applicants have determined that such a pool can be maintained as hereinafter described without diminution in the firm quantity of water that can be obtained from the Whale Rock Project for other beneficial uses and are willing to cooperate with the California Department of Fish and Game in the interest of maintaining the fisheries and recreational resources for the People of this State:

"NOW, THEREFORE, IT IS AGREED THAT:

"Subsequent to the first filling of the Whale Rock Reservoir to an amount in excess of 9,000 acre-feet, thereafter the amount of water therein will not be depleted to less than 2,000 acre-feet except during a dry period. For purposes of this Agreement a dry period will be considered to exist when, on April 1 of any year, storage in the reservoir is 9,000 acre-feet or less, and said dry period will continue until the inflow to the reservoir restores storage therein to 9,000 acre-feet or more. In the event storage in the reservoir is reduced to an amount of 9,000 acre-feet or less on April 1 of any year, the California Department of Fish and Game will be notified by the operator of the project on that date of that fact and that, during the ensuing 12 months, storage in the reservoir may be drawn below 2,000 acre-feet. During a dry period, at intervals not exceeding 30 days or as otherwise mutually agreed, the California Department of Fish and Game will be advised in writing by the operator of the project of the amount of water in storage and the current rate of depletion thereof. In the event that a series of years occurs in which the runoff in Old Creek watershed is substantially less than has occurred to date according to the records and studies of the Department of Water Resources upon which the Whale Rock Project has been planned, the parties hereto will meet and discuss the manner in which the pool above . . . can be reduced with a minimum of injuries to fishlife therein. . . ."

provide such a fishing program. We further think that the trial court reasonably apportioned the cost of the program on the basis of the parties' agreement as to the sharing of operating and maintenance costs of the reservoir.

Because the nature and extent of the sanitary facilities and surveillance that must be provided depends to a great extent on the amount of access provided for fishing, it is necessary to briefly address the question of how much of the reservoir must be opened to fishing. That the entire reservoir need not be opened is undisputed. Indeed, the evidence indicates that health officials would not permit the opening of certain portions of the reservoir. (See fn. 9, *ante.*)

We note that the trial court made findings as to the adequacy of access provided in certain fishing plans that were developed during attempts to reach a settlement. Although the trial court approved the "yellow plan" as providing minimally adequate public access and fishing area and disapproved the "red plan" as providing inadequate fishing area, we do not read the findings or judgment as requiring implementation of the "yellow plan" itself.[12] The judgment merely requires the city and the state, acting through the commission, to provide "adequate public access for fishing" and to establish, maintain and operate an "adequate public recreational fishing program." Although the "yellow plan" should serve as a model of the amount and type of public access to be provided, since this plan was developed during attempts to reach a settlement, it may be that all of the items specified therein are not required in order to obtain the requisite permit from the State Department of Health Services. (See fn. 10, *ante.*) We do not interpret the judgment as requiring any more supervision and facilities than that deemed necessary by the State Department of Health Services to protect the purity of the water. Thus, the ultimate determination of the facilities and supervision that must be provided is one which rests with the State Department of Health Services.[13]

---

[12]The trial court's finding as to the "yellow plan" states: "A minimally acceptable fishing plan would be one consisting of adequate public access and adequate fishing area such as the yellow plan described in the court record herein. The yellow plan has been approved by both State and local health officials." (Although health officials indicated they would find the yellow plan acceptable, that plan had not been officially submitted to them for approval and the granting of a permit based on it.)

[13]Appellants may, of course, seek judicial relief in the event that they believe the department's requirements unreasonable.

In connection with our conclusion that the trial court properly placed on appellants the burden of providing sanitary facilities and surveillance, we note that appellants are authorized by section 4465 of the Health and Safety Code to establish and collect reasonable fees for the use of the reservoir and its surrounding lands for fishing. We are aware of appellants' fear that the cost of such a fishing program will greatly exceed any fees that might be collected. There may, however, be sources of state or private funding available to assist in the underwriting of the capital and operational costs of the facilities required. Although the record reveals that some attempts were made to explore the possibility of outside funding, it does not appear that an exhaustive search has been made of the availability of such funding.

The judgment is affirmed. All parties are to bear their own costs on appeal.

Bird, C. J., Tobriner, J., Mosk, J., Richardson, J., and Newman, J., concurred.

**AUERBACH, J.,**\* Concurring and Dissenting.—I concur in the affirmance of the judgment.

I am constrained, however, to express my disagreement with the majority's determination that the Fish and Game Agreement did not create a consensual basis for public fishing in the reservoir.

The trial court found "The plain meaning of this agreement was that the permit applicants would provide for recreational use of Whale Rock Reservoir, which would in this case be fishing." I am in accord with that interpretation. It harmonizes with the principle that the intention of the parties must be ascertained from a consideration of the instrument as a whole (Civ. Code, § 1641), and the rule that a contract must be interpreted so as to give effect to the mutual intention of the parties as it existed at the time of the contract (see Civ. Code, § 1636).

These canons of construction make it reasonably apparent that the parties envisaged that recreational fishing was to be provided in the Whale Rock Reservoir.

---

\*Assigned by the Chairperson of the Judicial Council.

The agreement was engendered in the context of the withdrawal of protests by the California Fish and Game Commission to anterior applications by the appellants for permits to appropriate water from the Old Creek waterway for the Whale Rock project. As derived from the language of the 1957 agreement, the protests of the Fish and Game Commission to the respective applications were "in the interest of the protection, propagation and preservation of the fisheries and recreational resources afforded the public of this State in Old Creek . . . ."

The agreement embodies the following preambulatory clauses:

"WHEREAS, the California Department of Fish and Game has filed a protest to each of said applications in the interest of the protection, propagation and preservation of *the fisheries and recreational resources afforded the People of this State in Old Creek*; and

"WHEREAS, the California Department of Fish and Game has determined that, if the Applicants agree to maintain the pool in the proposed Whale Rock Reservoir, as hereinafter provided, *for the habitation of fish life and related recreation,* and if the proposed condition herein agreed upon is inserted in the permits and licenses issued pursuant to the above identified applications, *the interest of the People of this State in the fisheries and recreational resources involved* will be adequately protected and the protest of the California Department of Fish and Game to the above identified applications may be considered withdrawn and may be disregarded; and

"WHEREAS, the applicants have determined that such a pool can be maintained as hereinafter described without diminution in the firm quantity of water that can be obtained from the Whale Rock Project for other beneficial uses *and are willing to cooperate* with the California Department of Fish and Game *in the interest of maintaining the fisheries and recreational resources for the People of this State:*" (Italics added.)

"NOW THEREFORE IT IS AGREED THAT:"

(here follows language involving an agreement for maintenance of the pool conditions of the reservoir under varying meterological circumstances to minimize damage to the fishlife.)

The recitals quoted unequivocally explain the objectives of the agreement and the commitments undertaken. The iteration and reiteration of the italicized phrases in the recitals manifest the intention of the signatories to maintain "fisheries" and "related recreation." The juxtaposition of the terms "fisheries" and "related recreation" is of compelling significance. It suggests, beyond peradventure, that the recreation contemplated by the parties was the public pursuit of piscatorial pleasures.

The word "fisheries" is a term of art. It is the plural of fishery and is the semantic and legal equivalent of the word fishing. The cases which refer to and discuss "fishery" and "fisheries" do so in the connotation of established common law rights to catch or take fish at a certain place or in particular waters. See *Ex Parte Bailey* (1909) 155 Cal. 472, 475 [101 P. 441]; *Pacific etc. Co.* v. *Packers' Assn.* (1909) 138 Cal. 632, 636-637 [72 P. 161]; *Bohn* v. *Albertson* (1951) 107 Cal.App.2d 738, 753 [238 P.2d 128].

Thus the nexus of "fisheries" and "related recreation" negates any reasonable interpretation of the agreement as providing merely for an aquarium ancillary to the reservoir.

Recitals in a covenant have binding force when it is shown that they form part of the underlying agreement. *Hunt* v. *United Bank & Trust Co.* (1910) 210 Cal. 108, 115 [291 P. 184]. The instrument taken as a whole operates to effectuate the unambiguous intent of the parties to perpetuate the indigenous fishlife for fishing and for recreation related to that activity.

The agreement, being instinct with the obligation of appellants to maintain the recreational resources of the reservoir, cannot be construed to relieve appellants of responsibility for financing the fishing program. Such a construction would render their commitment nugatory and would emasculate the public's right of access to the reservoir for fishing purposes. The allocation of financing costs under the equitable formula adopted by the trial court is thus predicated on the implications of the agreement, as supplemented by a later contract apportioning the operational and maintenance costs of the project.

I would affirm the judgment on the additional ground expressed herein.