Opinion
McMAHON, J.
Respondents were charged with violating section 1603 of the Fish and Game Code. The second amended complaint specifically alleged that between February 4, 1982, and March 8, 1983, respondents “did substantially divert or obstruct the natural flow or substantially change the bed, channel, or bank of the Tajigas Creek.” Respondents demurred on the ground that this language, taken from the language of the statute, was vague. This particular demurrer, was finally sustained without leave to amend and the People appeal from the ensuing judgment of dismissal.
Introduction
The reader is undoubtedly aware that all water in California is the property of the People of this state. Indeed, the general welfare requires that the water resources of the state be put to beneficial use to the fullest extent to which they are capable, and that the waste or unreasonable use of water must be prevented (Cal. Const., art. X, § 2, Wat. Code, §§ 102 and 1201; National Audubon Society v. Superior Court (1983) 33 Cal.3d 419, 441-443 [189 Cal.Rptr. 346, 658 P.2d 709]).
Just as the State of California holds all of its navigable waterways[2] and the lands lying beneath them as a trustee of a public trust for the benefit of *Supp. 29 the People (Colberg Inc. v. State of California ex rel. Dept. of Pub. Wks. (1967) 67 Cal.2d 408, 416 [62 Cal.Rptr. 401]), the state acts as a trustee of all waters for the benefit of the People of the State (Ivanhoe Irr. Dist. v. All Parties (1957) 47 Cal.2d 597, 625 [306 P.2d 824]), reversed on other grounds sub nom. in Ivanhoe Irrig. Dist. v. McCracken (1958) 357 U.S. 275 [2 L.Ed.2d 1313, 78 S.Ct. 1174].
Diversion of water is a trespass which may be enjoined by the state (Wat. Code, § 1052). A person desiring to appropriate water cannot do so unless he obtains a permit (Water Code, §§ 1225, 1250 et seq.; People v. Shirokow (1980) 26 Cal.3d 301, 309-310 [162 Cal.Rptr. 30, 605 P.2d 859]. No dam or reservoir can be constructed or enlarged without the state’s approval. (See Wat. Code, §§ 6025, 6077, 6150 and 6200.)
A person who dumps trash, garbage or construction material into a bay, lagoon, channel creek or stream or upon a bank is guilty of a misdemeanor (Pen. Code, § 374e). One cannot install a septic tank upon the borders of any stream which is used to supply water to the public if the water source would thereby become polluted (Health & Saf. Code, § 4451). It is unlawful to wash clothes in a stream used for drinking purposes (Health & Saf. Code, § 4456). No one can allow horses, cattle, sheep or any kind of livestock or domestic animals to pollute waters used for drinking purposes (Health & Saf. Code, § 4454) and the maintenance of a hogpen and manure pile adjacent to a river bank may be enjoined. (People v. Elk River M. & L. Co. (1895) 107 Cal. 214 [40 P. 486]; Wade v. Campbell (1962) 200 Cal.App.2d 54, 57 [19 Cal.Rptr. 173, 92 A.L.R.2d 966]).
An act of pollution, obstruction, or diversion of water by a governmental entity also constitutes a nuisance under Civil Code section 3479 (Helix Land Co. v. City of San Diego (1978) 82 Cal.App.3d 932, 949 [147 Cal.Rptr. 683]).
While an injunction can be sought to prevent by diversion, dimunition or increase of flow in its natural channels (See Code Civ. Proc., § 530), it has been held that straightening, widening or deepening the channel of a stream to improve the drainage entails no “diversion” of the waters therein (Archer v. City of Los Angeles (1941) 19 Cal.2d 19, 26 [119 P.2d 1]; Callens v. County of Orange (1954) 129 Cal.App.2d 255, 259-260 [276 P.2d 886]). Hence, so long as the improvements which accelerate the flow of water follow the natural stream or natural drainage, no cause of action arises from an overflow (Deckert v. County of Riverside (1981) 115 Cal.App.3d 885, 895-896 [171 Cal.Rptr. 865]; cf. Bauer v. County of Ventura (1955) 45 Cal.2d 276, 283 [289 P.2d 1]).
*Supp. 30 Although the reader might visualize a stream as a watercourse through which water flows during all times of the year, the term “stream” is more broadly defined: “ ‘A stream is a watercourse having a source and terminus, banks and channel, through which waters flow, at least periodically. Streams usually empty into other streams, lakes, or the ocean, but a stream does not lose its character as a watercourse even though it may break up and disappear. (Citation.) Streams are usually formed by surface waters gathering together in one channel and flowing therein. The waters then lose their character as surface waters and become stream waters. (Citations.) . . . [A] continuous flow of water is not necessary to constitute a stream and its waters stream waters’ ” (Mogle v. Moore (1940) 16 Cal.2d 1, 9 [104 P.2d 785]). Indeed, a wash. . . “is a watercourse in the legal sense although dry except in the winter and spring and very possibly at intervals even in those seasons.” (San Gabriel V. C. Club v. Los Angeles (1920) 182 Cal. 392, 397 [188 P. 554, 9 A.L.R. 1200], see also, Weck v. L. A. County Flood Dist. (1947) 80 Cal.App.2d 182, 193 [181 P.2d 935].)
Therefore, it is obvious that water rights have been the subject of pervasive regulation in California. We next must ask why the Legislature should be so concerned with changes in the banks of an intermittent river, or the removal of material from the stream beds. To attempt to supply an answer, we must recount a bit of California history.
Over 100 years, gold drew throngs of adventurers to early mining communities in the Sierra Nevada. When the halcyon years were over, a few earnest argonauts decamped and went to the river bottoms, and pointed great water cannons, called monitors, at the hillsides hoping to dislodge sparkles of gold from the sandy detritus: In the process, they created new towns in the watersheds of the Bear, American and Yuba Rivers, with colorful names, such as You Bet, Red Dog, French Corral, and Timbuctoo.
Although considerable quantities of gold washed down and were separated from the gravel, the hydraulic mines annually discharged 600,000 cubic yards of debris, which soon choked the American and Sacramento Rivers with tailings, raised the beds of these rivers, impairing navigability, fouling the waters, and angering farmers.
Amid political turmoil, the matter finally reached our high court, which held that an injunction should issue, based upon the premise that the rights of the people in navigable rivers were paramount, and that any intrusions upon that right constituted a nuisance (People v. Gold Run D. & M. Co. (1884) 66 Cal. 138 [4 P. 1152]).[3]
*Supp. 31 This decision led to the virtual demise of hydraulic mining, and the Legislature finally responded by declaring that hydraulic mining could only be carried on if it could be done without material injury to navigable streams or the lands adjacent thereto (Pub. Resources Code, § 2602). Placer miners must construct settling ponds, and take other precautions, and the operation of such a mine may be enjoined if it causes the water supply to be rendered unfit or dangerous for human consumption (Pub. Resources Code, §§ 2555 and 2558). In addition, one who desires to reflect, alter or divert the course of a nonnavigable stream in any surface mining dredging operation must obtain the approval of the board of supervisors (Wat. Code, § 7047).
Turning our attention to the immediate origins of section 1603 of the Fish and Game Code, it appears over the years, the Legislature, concerned with the decline in the fish population, enacted a number of laws including those, 1) prohibiting persons from depositing any substance or material deleterous to fish where it could pass into the waters of the state (Fish & G. Code, § 5650, subd. (f), see also People v. Truckee Lumber Co. (1897) 116 Cal. 397 [48 P. 374] [sawdust and waste polluted stream and killed fish]), 2) prohibiting mining operations in the Trinity and Klammath game district for four months each year, except when mining debris could not pass into the waters, (Fish & G. Code, § 5800), 3) making it unlawful to construct or maintain devices in certain streams which impeded the passing of fish up and down the stream (Fish & G. Code, § 5901), 4) authorizing the Fish and Game Commission to require the owner of any new or enlarged dam to install and maintain fishways (Fish & G. Code, §§ 5933 and 5935), and, 5) allowing access to waters impounded by a dam to fishermen during the open season (Fish & G. Code, § 5943; State of California v. San Luis Obispo Sportsman’s Assn. (1978) 22 Cal.3d 440 [149 Cal.Rptr. 482, 584 P.2d 1088], see also, 53 Ops.Cal.Atty.Gen. 332, 340-343 (1970) [discussing the fact that proposed damming of streams created serious problems for anadromous and resident species such as salmon, steelhead and trout]).
Despite these efforts, siltation caused by the removal and washing of aggregate seriously affected anadromous fish, such as salmon and steelhead, by preventing spawning and suffocating eggs and fry. Aggregate operations had rendered certain portions of the Tuolumne River useless for spawning and placed the American River in jeopardy. See Report of Senate Permanent Fact Finding Committee on Natural Resources, Aggregate Removal From Streambeds, section 1, pages 13, 17, 18, 2 Appendix to Journal of the Senate (1961 Reg. Sess. Vol.) (quoted in 56 Ops.Cal.Atty.Gen. 360, 362, 364 (1973)).
Therefore, the Legislature enacted what is now section 1603 of the Fish and Game Code which makes it unlawful to substantially divert or obstruct *Supp. 32 the natural flow, or substantially change the bank, of any stream or lake, or to use any material from the streambeds, without first notifying the Department.[4] Section 1601 of the Fish and Game Code also requires governmental entities to notify the Department of any project which will divert, obstruct or change the natural flow of any river, stream or lake, or if there is at any time a fish or wildlife resource, or from which these resources derive benefit, or when the project will use materials from streambeds designated by the Department (Fish & G. Code, § 1601).[5]
Although both statutes envision that the rivers, streams or lakes shall be “designated by the Department,” the Department chose to designate all rivers, streams, lakes and streambeds in the State of California, including those which may have “intermittent” flows of water (Cal. Admin. Code, tit. 14, § 720). The Court of Appeal recently upheld the Department’s right to designate all state waterways. Therefore a violation of section 1603, either by failing to notify the Department of a project, or by refusing to incorporate the Department’s proposed modifications or the decision of the arbitration panel into the project, is a misdemeanor (see 57 Ops.Cal.Atty.Gen. 475 , 476 (1974); Willadsen v. Justice Court (1983) 139 Cal.App.3d 171 [188 Cal.Rptr. 488]).
The Attorney General has reasoned that because gravel operations frequently result in excavations of pits, and at high water, the course of the river is often changed due to such excavations, and because the statute makes specific reference to any person who substantially diverts the natural flow, the statute necessarily applies to any gravel operations in the flood plain which could alter the course of the river or stream (56 Ops.Cal.Atty.Gen. 360, 361-363 (1973)).
However, by a bold stroke of the pen, the Department, by designating all intermittent streams, has included virtually every watercourse in the state, including those which never have contained fish. Perhaps, because of the Legislature preeamble stating that the conservation of fish and wildlife resources are declared to be of utmost public interest (Fish & G. Code, § 1601), the Department desired to also protect the environment of creatures who live in the desert washes (not to mention the mojave snipe, sought in vain by countless high school and college students).
*Supp. 33 Leaving this interesting inquiry aside, we note that over a decade ago, the Attorney General, was equally troubled by the phrase “any person who substantially diverts ... the natural flow ... of any river, stream . . .” He concluded that any pump diversion was capable of dewatering a stream which could result in detriment to fishlife, but that “a general rule cannot be laid down for what would constitute a substantial diversion, because of innumerable factual variations,” 56 Ops.Cal.Atty.Gen. 360, 364-365.
One would think that someone in the Legislature would have been alerted to the problem raised by the Attorney General. However, even clear admonitions found in published opinions by our Supreme Court go entirely unnoticed. (See, e.g., Sumner v. Workers’ Comp. Appeals Bd. (1983) 33 Cal.3d 965, 971-972 [191 Cal.Rptr. 811, 663 P.2d 534]). Unfortunately, the Legislature “in the main operates amid tumult” and too often without adequate study of the measures which come before it. As the late Chief Justice Roger Traynor so eloquently said:
“Pending the millenium, however, we must resign ourselves to the antic ways of legislators. Now and then they are very good indeed, thanks to a talented draftsman among them and their own good will to work. Now and then they are very good by chance approving a well drafted bill, for extraneous reasons, that they have not troubled to read. Too often they legislate madly, confounding the confusions of one paragraph with several more to explain what the first paragraph is deemed to mean if read alone, if read in conjunction with two others, or if read pursuant to the famous Welsh treatise on the active and inert elements of a homeless verb.”
“Recurringly, legislators abstain from any action, moving ingeniously their wonders not to perform. When they abdicate responsibility for clarifying the controversial language of their own statutes, in effect they relegate the task to the courts. ...” (Traynor, The Limits of Judicial Creativity (1978) 29 Hastings L. J. 1025, 1029.)
Standing
Generally, one will not be heard to attack a statute on grounds that are not shown to be applicable to himself and the court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations. (In re Cregler (1961) 56 Cal.2d 308, 313 [14 Cal.Rptr. 289, 363 P.2d 305]; Willadsen v. Justice Court, supra, 139 Cal.App.3d 171, 178.) Stated otherwise, one who has received fair warning of the criminality of his conduct from the statute in question is not entitled to attack it because the language would not give similar fair warning with *Supp. 34 respect to other conduct which might be within its broad and liberal ambit. “One to whose conduct a statute clearly applies may not successfully challenge it for vagueness. ” (Parker v. Levy (1974) 417 U.S. 733, 756 [41 L.Ed.2d 439, 458, 94 S.Ct. 2547].)
The People question respondents’ standing to challenge the statute in question, suggesting that if they had constructed a dam impounding 12,000 acre feet of water they clearly would have violated section 1603 of the Fish and Game Code. [6] The trouble with this argument is that the People framed the pleading in the language of the statute, and a person reading the complaint is at a loss to understand exactly what respondents did to “substantially divert or obstruct the flow or substantially change the bed, channel or bank of Tajigas Creek.” Although respondents did not challenge the form of the pleading in their demurrer to the second amended complaint,[7] it would seem that this is a situation where the People should have identified the exact nature of the unlawful conduct so that respondents could prepare their defense and not be taken by surprise at trial. (See In re Hess (1955) 45 Cal.2d 171, 175 [288 P.2d 5]; Sallas v. Municipal Court (1978) 86 Cal.App.3d, 737, 743, [150 Cal.Rptr. 543]; In re Rudolfo A. (1980) 110 Cal.App.3d 845, 853-857 [168 Cal.Rptr. 338]; Lamadrid v. Municipal Court (1981) 118 Cal.App.3d 786 [173 Cal.Rptr. 599].)
In any event, the People do concede, somewhat grudgingly, that the Court of Appeal has held that when the accused files a demurrer, and there is no factual record, he has standing to challenge the statute on the grounds of vagueness and overbreadth to the extent such infirmities can be detected from a general reading of the statute and its probable, logical application. (Gates v. Municipal Court (1982) 135 Cal.App.3d 309, 316 [185 Cal.Rptr. 330].) We will, therefore, address the merits of the statute.
Vagueness
Respondents insist that the statute is neither fish nor fowl and that a poor soul might be hauled into court for constructing a sandcastle in a river estuary.
We acknowledge that the void for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner *Supp. 35 that does not encourage discriminatory enforcement. When the Legislature fails to establish minimal guidelines to govern law enforcement, a criminal statute may permit “a standardless sweep [that] allows policemen, prosecutors, and juries, to pursue their own personal predilections.” (Kolender v. Lawson (1983) 461 U.S. 352, 358 [75 L.Ed.2d 903, 909, 103 S.Ct. 1855, 1858-1859], citations omitted.)[8] “No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed of what the State commands or forbids [citations omitted].” (Lanzetta v. New Jersey (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618]). “[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law [citations omitted].” Connally v. General Construction Co. (1926) 269 U.S. 385, 391, [70 L.Ed. 322, 328, 46 S.Ct. 126].
The root of the vagueness doctrine is a rough idea of fairness. This doctrine is not designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide a fair warning that certain kinds of conduct are prohibited. (Colten v. Kentucky (1972) 407 U.S. 104, 110 [32 L.Ed.2d 584, 589, 92 S.Ct. 1953]).
The prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have inherent vagueness, for in English words and phrases, there lurk uncertainties. Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. (Rose v. Locke (1975) 423 U.S. 48, 49-50 [46 L.Ed.2d 185, 187-188, 96 S.Ct. 243].)
*Supp. 36 Lack of precision itself, in a criminal statute, is not offensive to the requirements of due process. “[A]ll that is required is that the language ‘conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . . That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no definite reason to hold the language too ambiguous to define a criminal offense. . . .’ [Citations omitted.]” (Roth v. United States (1957) 354 U.S. 476, 491-492 [1 L.Ed.2d 1498, 1510-1511, 77 S.Ct. 1304].)
“‘A statute is not necessarily invalid even though in its definition some matter of degree may be involved; it will not generally be held invalid if the language is sufficient to enable the attorney to explain to his client and advise what questions may be left to the determination of the jury so that he will be able to govern himself accordingly; neither is it necessary that the words have a universally recognized meaning ...” (People v. Poulin (1972) 27 Cal.App.3d 54, 60 [103 Cal.Rptr. 623]; People v. Roberts (1981) 114 Cal.App.3d 960, 963 [170 Cal.Rptr. 872]).
Likewise, offenders cannot complain of the vagueness of a statute if the conduct with which they are charged falls clearly within its bounds (Bowland v. Municipal Court (1976) 18 Cal.3d 479, 492, [134 Cal.Rptr. 630, 556 P.2d 1081]).
Thus, under California law, “Reasonable certainty is all that is required. A statute will not be held void for uncertainty if any reasonable and practical construction may be given its language [citations omitted].” (People v. Superior Court (Hartway) (1977) 19 Cal.3d 338, 345 [138 Cal.Rptr. 66, 562 P.2d 1315]. If ambiguity is found, the statute must be interpreted in light of the objective sought to be achieved by it as well as the evil sought to be averted. (In re Andrews (1976) 18 Cal.3d 208, 212 [133 Cal.Rptr. 365, 555 P.2d 97].) A practical construction is preferred to one that is technical and is required when the latter would lead to mischief, or absurdity. (Stanley v. Justice Court (1976) 55 Cal.App.3d 244, 253 [127 Cal.Rptr. 532]; Jersey Maid Milk Products Co. v. Brock (1939) 13 Cal.2d 620, 648 [91 P.2d 577].)
The word “substantial” is a relative term and its meaning must be gauged by the circumstances. (Atchison, etc. Ry. Co. v. Kings Co. Water Dist. (1956) 47 Cal.2d 140, 144, [302 P.2d 1]; People v. Barksdale (1972) 8 Cal.3d 320, 328 [105 Cal.Rptr. 1, 503 P.2d 257].) While there obviously are contexts in which the word “substantial” found in legislation may offend due process standards (see, e.g., People v. Barksdale, supra, [“substantial risk that the continuance of the pregnancy would gravely impair the physical *Supp. 37 or mental health of the mother”]), or lack clarity, e.g., (Kuhns v. Board of Supervisors (1982) 128 Cal.App.3d 369, 376 [118 Cal.Rptr. 1] [no more than a “substantial or significant portion” of the books or magazines may be “adult”]), “The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as ‘reasonable,’ ‘prudent,’ ‘necessary and proper,’ ‘substantial,’ and the like. Indeed, a wide spectrum of human activities is regulated by such terms: . . . [y]et standards of this kind are not impermissibly vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind.” (People v. Daniels (1969) 71 Cal.2d 1119, 1128-1129 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677].)
Thus, in People v. Daniels, supra, 71 Cal.2d 1119, 1139, the court held that the phrase “kidnaps or carries away any individual to commit robbery” found in Penal Code section 209 did not apply either to stand-still robberies or those where the movements of the victim are merely incidental to the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself. In County of Nevada v. MacMillen (1974) 11 Cal.3d 662, 672-674 [114 Cal.Rptr. 345, 522 P.2d 1345], the Supreme Court had no difficulty holding that the terms “substantial conflict” and “material economic effect” found in the conflict of interests statute were sufficiently definite to give adequate warning to public officials of its prohibitions and requirements. Likewise, courts have had no difficulty separating the wheat from the chaff, by deciding whether the exemption found in Public Resources Code section 21170 for “substantial construction” applied (Cooper v. County of Los Angeles (1977) 69 Cal.App.3d 529, 538-539 and cases cited [138 Cal.Rptr. 229]).[9]
We are satisfied that while the wording of most of the prohibitions found in section 1603 of the Fish and Game Code “may not satisfy those intent on finding fault at any cost, they were set out in terms that the ordinary person exercising common sense can sufficiently understand and comply with. ...” (CSC v. Letter Carriers (1973) 413 U.S. 548, 578-579 [37 L.Ed.2d 796, 816-817, 93 S.Ct. 2880]).
In enacting section 1603 of the Fish and Game Code, we feel confident that the Legislature was not concerned with children skipping rocks across a stream, or building sandcastles, or hikers dislodging a few stones as they climbed the bank of a river. On the contrary, by using the word substantially, the Legislature certainly intended to prohibit an owner from bulldoz *Supp. 38 ing material in a streambed which would cause the stream to change its course materially, or a like change which might interfere with the spawning grounds of anadromous fish, unless the plans were first approved by the Department (or found to have an insignificant effect upon the ecosystem in the vicinity of the projected change). Our conclusion is fortified by the language which prohibits using any material from the streambeds unless the Department was notified. Therefore, a person moving sand or gravel from a streambed acts at his peril unless he or she first notifies the Department.
We acknowledge that there are grounds for valid differences of opinion as to what constitutes a substantial diversion of the natural flow of a stream. This same issue troubled the Attorney General a decade ago, and apart from the problem of quantifying what is meant by a substantial diversion, we wonder how this particular prohibition may affect farmers who exercise riparian rights and who might be wholly unaware of this law. We suggest that this subject merits reconsideration by the Legislature.
However, as to those portions of the statute prohibiting 1) substantial obstructions of the natural flow; 2) substantial changes in the bed, channel or bank of any river, stream or lake, and 3) using any material from the streambed, we are satisfied that the statute withstands a due process challenge. Indeed, given the numerous statutes which we collected in the introduction to this opinion, and the language found in section 1603 of the Fish and Game Code, we think that persons who despoil a streambed, without a permit, could legitimately expect to be hauled into court. Because respondents are charged with these unlawful acts, the order dismissing the case must be reversed.
Disposition
The order of dismissal is reversed, and the People are directed to amend the complaint to define the unlawful acts in question.
Respondents Donald Ward Weaver and Larry Ortner shall appear in person or through counsel on September 8, 1983, in the Municipal Court of the South Coast Judicial District at 8:30 a.m. Further criminal proceedings may resume at that time.
Stevens, P. J., concurred.

Although a waterway usable only for pleasure boating is nevertheless a navigable waterway, subject to the public trust doctrine, our Supreme Court has not decided whether the public trust doctrine extends to nonnavigable streams to protect fishing, environmental values and recreational interests (see National Audubon Society v. Superior Court, supra, 33 Cal.3d 419, 435, and fn. 17 and 437, fn. 19). As we shall see, sections 1601 and 1603 of the Fish and Game Code endow the Department of Fish and Game (Department) with broad trust powers over nonnavigable streams. Indeed, if nonnavigable rivers are not subject to some regulation, why did the Legislature think it necessary to give a board of supervisors power to provide for the widening, deepening, straightening, removing obstructions from, or otherwise improving nonnavigable streams, the overflow of which interferes with Highways and for protecting the banks and adjacent lands from such overflow (Wat. Code, § 8126)?

For further reading, see Kelly, Gold v. Grain, The Hydraulic Mining Controversy in California’s Sacramento Valley. (Arthur Clark Co., Glendale, Cal. 1959.)

It could be argued that because this statute was enacted for the benefit of the public, a widening or deepening of a watercourse without a permit could give rise to a right of action in favor of a downstream property owner whose land was inundated by a deluge (compare Archer v. City of Los Angeles, supra, 19 Cal.2d 19).

The difference between the general prohibition found in section 1603 and the additional language found in section 1601, which applies to governmental entities, is curious, but of no significance, because all streambeds are so designated.

Actually, as previously noted, that type of conduct would violate other specific provisions of law.

In an earlier demurrer, respondents did persuade the People that it wasn’t cricket to charge identical violations of the same statute in different counts (People v. Jordan (1971) 19 Cal.App.3d 362 [97 Cal.Rptr. 570]).

The following passages from Lewis Carrol’s Alice’s Adventures and Through the Looking Glass (Grosset & Dunlap ed.) illustrates the pernicious aspects of this doctrine.
“At this moment the King, who had been for some time busily writing in his notebook, called out ‘Silence!’ and read out from his book, ‘Rule Forty-two. All persons more than a mile high to leave the court. ’
“Everybody looked at Alice.
‘“I’m not a mile high,’ said Alice.
“ ‘Nearly two miles high,’ added the Queen.
“ ‘You are,’ said the King.
“‘Well, I shan’t go¿ at any rate,’ said Alice; ‘besides, that’s not a regular rule; you invented it just now. ’
“ ‘It’s the oldest rule in the book,’ said the King.
“ ‘Then it ought to be Number One,’ said Alice.
“The King turned pale, and shut his notebook hastily. ‘Consider your verdict.’ he said to the jury in a low, trembling voice.’ ” (Alice, op. cit., at p. 132.)

We excluded the “substantial evidence” test (e.g., Foreman & Clark Corp. v. Fallon (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362]), from this brief compendium; far too often, counsel for appellants are oblivious to its requirements.