[No. D003131. Fourth Dist., Div. One. Jan. 9, 1987.]

E. C. RUTHERFORD et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

COUNSEL

Diane Altamirano and Boggust, Zimmerman & Altamirano for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, David L. Chandler and Denis D. Smaage, Deputy Attorneys General, for Defendants and Respondents.

OPINION

WORK, J.—E. C. Rutherford, S. P. Rutherford, and Julia Ann Reutter (Rutherford) appeal a judgment in favor of the State of California, Resources Agency, Department of Fish and Game, and several individuals for injunctive and declaratory relief, inverse condemnation, violation of constitutional rights pursuant to 42 United States Code section 1983 and violation of rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. Rutherford contends the trial court erred in finding Fish and Game Code section 1603[1] constitutional on its face and as applied; collateral estoppel did not apply; there was no federal or civil rights violation; and the officers were immune for their actions as there was no malice shown. We conclude these contentions are meritless and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Rutherford owns approximately the north one-half of the San Felipe Valley, consisting of meadow and range land historically used for grazing cattle and farming. The specific area of this large parcel involved in this litigation is a meadow which is a natural watershed and water storage area; however, at no time during Rutherford's ownership of the property before

---

[1] All statutory references are to the Fish and Game Code unless otherwise specified.

1980 had the water overflowed at that location. The normal rainfall in the area had been approximately 45 inches a year, but for the 2 years preceding the first quarter of 1980, the rainfall was approximately 65 to 70 inches. The meadow and underlying aquifer filled with water, became saturated and created washed-out areas. These washes ranged from 25 to 75 feet wide and 25 to 30 feet deep at the south end of the property. Toward the north and uphill, the washes became narrower and shallower.[2] Once the rain ceased, it took approximately 14 to 15 months for the area to dry before heavy equipment and machinery could be brought in to repair the washouts and damage. Rutherford obtained a Small Business Administration emergency loan to repair since the area had been declared a disaster area. He began putting roads across the still saturated meadow, horizontal to the washout, at 500 to 600 feet intervals. The majority of the dirt for the 20- to 25-foot wide and 2- to 3-foot high roads was taken from the high sides of the streambed.

On May 22, 1981, all the roads were completed and the repair work was essentially 90 percent complete. On that date, Carl Bumgarner of the Fish and Game Department (Department) approached the job foreman and asked whether permits had been obtained. The foreman stated he did not know. (The record is in dispute whether Bumgarner told the foreman to cease work because if there were no permits they might have to remove what they had completed.) The Department acted pursuant to section 1603, requiring Rutherford to notify it of any changes in the bed, channel, bank of a river, stream or lake designated by the Department. Apparently, the work did cease and the equipment stood idle for a time before the construction work was completed in early 1983.

Rutherford was charged with violating section 1603 for failing to file a notification of the work intended and, following trial, was convicted. On appeal to the appellate department of the superior court, his misdemeanor conviction was summarily reversed without opinion.

This civil action is on Rutherford's fifth amended complaint. The trial was bifurcated with the legal issues tried first, resulting in a defense judgment based on the findings section 1603 is constitutional on its face and was not unconstitutionally applied, collateral estoppel does not apply, the absence of any federal civil rights violations, and the officers are immune from suit because they acted without malice.

---

[2]The southern portion of the property is in the 1,600- to 1,800-foot elevation, while the property extends north for approximately 4 to 5 miles and rises to an elevation of 2,500 feet. The Volcan Mountains extend to the west at an elevation of about 5,500 feet and another mountain of approximately 3,500 to 4,000 feet stands to the east of the lowest area of this property.

## THE TRIAL COURT PROPERLY FOUND SECTION 1603 WAS
## CONSTITUTIONAL ON ITS FACE AND AS APPLIED

Rutherford first contends the trial court should have found section 1603 unconstitutionally vague, for not meaningfully defining the terms "notice," "substantially divert," "stream," "streambed" and "emergency work necessary to protect life or property," or for lacking a clear standard to determine when an existing fish or widlife resource is likely to be adversely affected. Because of its perceived unconstitutionality, Rutherford claims the statute does not clothe the Department's conduct with legal authority. Moreover, he claims the statute was unconstitutionally applied in that the Department failed to verify whether fish and wildlife would be adversely affected by Rutherford's activities.

In reviewing the constitutionality of a legislative provision, we presume its validity, resolving all doubts in favor of the legislative act. In other words, it will be upheld unless it clearly and unquestionably conflicts with a provision of the state or federal Constitution. (*California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) However, "[s]tatutes, regardless whether criminal or civil in nature, must be sufficiently clear as to provide adequate notice of the prohibited conduct as well as to establish a standard of conduct which can be uniformly interpreted by the judiciary and administrative agencies [citation]." (*Hall* v. *Bureau of Employment Agencies* (1976) 64 Cal.App.3d 482, 491 [138 Cal.Rptr. 725]; *United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 176 [154 Cal.Rptr. 263].) In other words, it is firmly established " 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' [Citation.] This principle applies not only to statutes of a penal nature but also to those prescribing a standard of conduct which is the subject of administrative regulation. [Citations.]" *(McMurtry v. State Board of Medical Examiners* (1960) 180 Cal.App.2d 760, 766 [4 Cal.Rptr. 910]; *Hall* v. *Bureau of Employment Agencies, supra,* 64 Cal.App.3d at p. 491.)

Accordingly, within this context, statutes will be upheld unless their unconstitutionality as to vagueness clearly, positively and unmistakably appears. (*United Business Com.* v. *City of San Diego, supra,* 91 Cal.App.3d at p. 176.) Indeed, reasonable certainty under the circumstances is all that is required; for, a statutory provision will not be declared void for uncertainty if any reasonable and practical construction can be attached to the language. (*In re Carson Bulletin* (1978) 85 Cal.App.3d 785, 794 [149 Cal.Rptr. 764]; see also *United Business Com.* v. *City of San Diego, supra,* 91 Cal.App.3d at p. 176.)

Section 1603 makes it unlawful to substantially divert or obstruct the natural flow or substantially change the bank, of any stream or lake, or to use any material from the streambeds, without first notifying the Department.[3] Similarly, section 1601 requires governmental entities to

---

[3]Section 1603 provides: "It is unlawful for any person to substantially divert or obstruct the natural flow or substantially change the bed, channel, or bank of any river, steam or lake designated by the department, or use any material from the streambeds, without first notifying the department of such activity, except when the department has been notified pursuant to Section 1601. The department within 30 days of receipt of such notice, or within the time determined by mutual written agreement, shall, when an existing fish or wildlife resource may be substantially adversely affected by such activity, notify the person of the existence of such fish and wildlife resource together with a description thereof, and shall submit to the person its proposals as to measures necessary to protect fish and wildlife. Upon a determination by the department of the necessity for onsite investigation or upon the request for an onsite investigation by the affected parties, the department shall notify the affected parties that it shall make onsite investigation of the activity and shall make such investigation before it shall propose any measure necessary to protect the fish and wildlife.

"Within 14 days of receipt of the department's proposals, the affected person shall notify the department in writing as to the acceptability of the proposals, except that this time may be extended by mutual agreement. If such proposals are not acceptable to the affected person, then that person shall so notify the department. Upon request, the department shall meet with the affected person within seven days of receipt of such notification or such time as may be mutually agreed upon for the purpose of developing proposals which are acceptable to the department and the affected person. If mutual agreement is not reached at such meeting a panel of arbitrators shall be established; provided, however, that the appointment of such panel may be deferred by mutual consent of the parties. The panel shall be established within seven days of such meeting and shall be composed of one representative of the department, one representative of the affected person, and a third person mutually agreed upon, or if no agreement can be reached, the third person shall be appointed in the manner provided by Section 1281.6 of the Code of Civil Procedure. The third person shall act as panel chairman. The panel shall have power to settle disagreements and make binding decisions regarding fish and wildlife modifications. Such arbitration shall be completed within 14 days from the day that the composition of the panel is established, unless the time is extended by mutual agreement. Expenses of the department representative are to be borne by the department, expenses of the representative of the person who diverts or obstructs the natural flow or changes the bed of any river, stream or lake, or uses any material from the streambeds shall be borne by such person; expenses of the chairman are to be paid one-half by each party.

"It is unlawful for any person to commence any activity affected by this section until the department has found it will not substantially adversely affect an existing fish or wildlife resource or until the department's proposals, or the decision of a panel of arbitrators, have been incorporated into such projects. If the department fails to act within 30 days of the receipt of the notice, the person may commence such activity.

"It is unlawful for any person to engage in a project or activity affected by this section, unless such project or activity is conducted in accordance with the department's proposals or the decisions of the panel of arbitrators.

"With regard to any project which involves routine maintenance and operation of water supply, drainage, flood control, or waste treatment and disposal facilities, notice to and agreement with the department shall not be required subsequent to the initial notification and agreement unless the work as described in the agreement is substantially changed, or conditions affecting fish and wildlife resources substantially change, and such resources are adversely affected by the activity conducted under the agreement. This provision shall be applicable in any instance where notice to and agreement with the department have been attained prior to the effective date of this chapter.

"The provisions of this section shall not be applicable to emergency work necessary to protect life or property. Notification by the person performing such emergency work shall be made to the department within 14 days of commencement of such emergency work."

notify the Department of any project which will divert, obstruct or change the natural flow of any river, stream or lake, or if there is at any time a fish or wildlife resource, or from which these resources derive benefit, or when the project will use materials from streambeds designated by the Department. "Although both statutes envision that the rivers, streams or lakes shall be 'designated by the Department,' the Department chose to designate all rivers, streams, lakes and streambeds in the State of California, including those which may have 'intermittent' flows of water (Cal. Admin. Code, tit. 14, § 720)." (*People* v. *Weaver* (1983) 147 Cal.App.3d Supp. 23, 32 [197 Cal.Rptr. 521].) This designation of all state waterways by the Department was upheld in *Willadsen* v. *Justice Court* (1983) 139 Cal.App.3d 171, 175-177 [188 Cal.Rptr. 488]. ■ A violation of section 1603 is a misdemeanor. (*Id.,* at p. 176; *People* v. *Weaver, supra,* 147 Cal.App.3d Supp. at p. 32; 57 Ops.Cal.Atty.Gen. 475, 476 (1974).) Finally, since we construe a statute as consistently as possible with the objectives of the Legislature, we note section 1600 declares: "The protection and conservation of the fish and wildlife resources of this state are hereby declared to be of utmost public interest. Fish and wildlife are the property of the people and provide a major contribution to the economy of the state as well as providing a significant part of the people's food supply and therefore their conservation is a proper responsibility of the state. This chapter is enacted to provide such conservation for these resources."

■ Guided by the established standards requiring only reasonable certainty and the upholding of the statute if any reasonable and practical construction can be given its language by reference to other definable sources (*People* v. *Superior Court (Hartway)* (1977) 19 Cal.3d 338, 345 [138 Cal.Rptr. 66, 562 P.2d 1315]), we conclude the challenged phrases are not void for vagueness rendering the statute in its entirety unconstitutional. For, " '[t]he root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.' " (*People* v. *Superior Court (Hartway), supra,* 19 Cal.3 d at p. 347, quoting *Colten* v. *Kentucky* (1972) 407 U.S. 104, 110 [32 L.Ed.2d 584, 590, 92 S.Ct. 1953].)

Preliminarily, the first challenged term "notice" is not vague and standardless. ■ In fact, regardless of the precise legal context, "[t]he term 'notice' imports that the information given thereby comes from an authentic source and is directed to someone who is to act or refrain from acting in consequence of the information contained in the notice. [Citation.] It means the statutory instrumentality of knowledge; the formal process emanating from the source, and served in the manner prescribed by the statute. [Cita-

tions.] Accordingly, 'knowledge' is not synonymous or the equivalent of 'notice.' . . . [¶] While notice is generally imparted through the instrumentality of a writing . . . [, often the statute] does not require that the notice be written. Accordingly, it may be oral. [Citations.]" (*Bird* v. *McGuire* (1963) 216 Cal.App.2d 702, 713-714 [31 Cal.Rptr. 386].)

■ Confronted with similar constitutional challenges to statutory provisions regarding the adequacy of notice where the act fails to specify form, manner, extent or duration of notices, the courts consistently find the contentions untenable because due process does not require any particular notice form or procedural method. (See, e.g., *Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 80 [87 P.2d 848]; *Kennedy* v. *South Coast Regional Com.* (1977) 68 Cal.App.3d 660, 668-672 [137 Cal.Rptr. 396].)

■ Nor do we find the phrase "substantially divert" unconstitutionally vague. "The law is replete with instances in which a person must, at its peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' '*substantial*,' and the like. Indeed, a wide spectrum of human activities is regulated by such terms. . . . Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind." (*People* v. *Daniels* (1969) 71 Cal.2d 1119, 1128-1129 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677], italics added; *In re Carson Bulletin,* supra, 85 Cal.App.3d at p. 795; *People* v. *Weaver, supra,* 147 Cal.App.3d Supp. at p. 37.)

■ The term "substantial" has assumed a commonly understood meaning as characterizing something as ample or of considerable amount, quantity or size; while within the legal context, it has been defined as important or material and of considerable amount or value rather than inconsequential or small. (*In re Carson Bulletin, supra,* 85 Cal.App.3d at p. 795.) In *People* v. *Weaver, supra,* 147 Cal.App.3d Supp. at pages 37-38, the court held section 1603 and this precise phrase were not unconstitutionally vague.

■ Similarly, the term "stream" is commonly understood as " 'a watercourse having a source and terminus, banks and channel, through which waters flow, at least periodically. Streams usually empty into other streams, lakes, or the ocean, but a stream does not lose its character as a watercourse even though it may break up and disappear.' " (*Lukrich* v. *Rodgers* (1959) 176 Cal.App.2d 1, 7 [1 Cal.Rptr. 30], quoting *Mogle* v. *Moore* (1940) 16 Cal.2d 1, 9 [104 Cal.Rptr. 785].) In other words, a stream need not flow continuously and sometimes due to climatic conditions may outwardly appear dry. (*County of Sierra* v. *County of Nevada* (1908) 155 Cal. 1, 8 [99 P.2d 371].) ■ Moreover, a streambed is commonly understood as

"[t]he hollow or channel of a water course; the depression between the banks worn by the regular and usual flow of the water. The land that is covered by the water in its ordinary low stage. Area extending between the opposing banks measured from the foot of the banks from the top of the water at its ordinary stage, including sand bars which may exist between the foot of said banks as thus defined. [Citation.] It includes the lands below ordinary high water mark. [Citation.]" (Black's Law Dict. (5th ed. 1979) p. 140, col. 2.)

 Finally, the phrase "emergency work necessary to protect life or property" is neither vague nor ambiguous within the context of the statute. An emergency constitutes "[a] sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action." (Black's Law Dict., *supra,* at p. 469, col. 2.)

 Clearly, within the context of this case, the rainfall which caused the stream fell over a year before the work was commenced. We query how such work could be thus characterized as "emergency work." Nevertheless, within the permit scheme of section 1603, an emergency under this section would relate to an emergency within the 30-day period set forth within the statute.[4]

 We also reject the contention section 1603 was unconstitutionally applied. Preliminarily, not only did Rutherford testify the project was substantial in character, he also admitted in his pleadings the construction was designed to divert or obstruct flowing water. Indeed, given those facts, the Department was mandated by section 1603 to enter the property and inform the contractor as they did.

The evidence shows an agent of the Department on May 21, 1981, saw heavy construction equipment engaged in substantially altering the natural streambed and diverting the water from the stream. There had been no notification to the Department, an apparent section 1603 violation. The following day, two Department wardens asked the project foreman whether section 1603 permits had been obtained and advised him not to do any more work because the work completed might have to be removed. On the

---

[4]Rutherford's contention there is no standard by which to determine when an existing fish or wildlife resource may be adversely affected by an individual's activities begs the question underlying the purpose for the notification in the first place. Rather, it is the role of the Department to determine whether the individual's proposed activity will affect the existing fish or wildlife resources. Consequently, because notice is required under the statute before an individual acts and equally mindful of the breadth of the ordinance, this determination rests upon the Department and not the individual. In other words, there exists no due process consideration regarding an individual's conformity with the strictures of the statute.

following day, a Department representative went to the site to investigate and concluded a section 1603 violation had occurred because of the potential impact on downstream riparian vegetation from the diversion of a significant amount of water.[5] On May 26, Captain Greg Laret sent a letter to Rutherford, enclosing a notification form, requesting its completion and return, advising him it would be expedited, and declaring there was no authorization for any work on the streambed before completion of a signed agreement. Both Laret and Taylor conversed with Rutherford's attorney on May 27 at which time she advised them she believed the work was not covered by section 1603, the Department had no legal jurisdiction over the matter and Rutherford would refuse to submit any notifications. She threatened the Department with a lawsuit if it proceeded. They explained that a sufficiently detailed notification was statutorily required and was necessary to allow them to conduct a project analysis and make recommendations. She was told the work could only go forward under a signed agreement and that the matter could be expedited and completed *within five days.* If Rutherford cooperated, he was advised no criminal charges would be filed. Had he complied by submitting the forms given him, no fees would have been required. Rutherford adamantly refused.

On May 29, an agent returned to San Felipe Creek and walked a portion of the creek ten miles downstream from the work site where he observed two different species of fish. With this background, the Department concluded Rutherford's complete failure to notify the Department pursuant to section 1603 left it with no option but to file a criminal complaint. In an effort to expedite compliance and avoid criminal prosecution, a county employee, Joseph Barry, acted as a "go-between" and apparently took a completed notification form to Rutherford's secretary. He ignored it. His recalcitrance was unabated following the filing of the criminal complaint and the conviction. When an agent later met Rutherford and roughed out a notification and application for a permit consistent with section 1603, leaving a blank form with him, it was never filed. ██ ██ On these facts, there is no evidentiary basis to find the Department unconstitutionally applied this statute.[6]

---

[5]Over that weekend, Bumgarner originally informed Rutherford a streambed alteration notification would not be required. However, after Taylor examined the site, he determined a notification and permit would be required and instructed Bumgarner to advise Rutherford.

[6]Guided by the California Tort Claims Act (Gov. Code, § 810 et seq.) and specifically Government Code sections 820.2, 820.4, 820.6, 821.6 and 821.8, this factual record would not support any determination the Department or its agents acted with malice or without due care subjecting them as individual defendants to any liability for exercising their discretion and enforcing section 1603 which we have held as facially constitutional.

### There Is No Collateral Estoppel

 Rutherford next contends the appellate department of the superior court's reversal of his misdemeanor conviction for violating section 1603 (apparently on constitutional grounds) should have been considered as collateral estoppel on the issue here regarding whether section 1603 was indeed unconstitutional. In other words, he contends the trial court's refusal to find the appellate department's ruling of apparent unconstitutionality to be collateral estoppel was error. We disagree.

Rutherford's conviction of violating section 1603 in the municipal court was reversed on appeal by the appellate department of the superior court in San Diego County. The only issues briefed by the parties concerned the constitutionality of section 1603, both facially as being void for vagueness and inferentially as applied in this case. The appellate department's opinion in its entirety reads: "It is the unanimous opinion of our appellate department that the judgment is reversed."

 Collateral estoppel bars relitigating an issue decided at a previous proceeding " 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior [proceeding].' " (*People* v. *Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321], quoting *People* v. *Taylor* (1974) 12 Cal.3d 686, 691 [117 Cal.Rptr. 70, 527 P.2d 622]; *Mueller* v. *J. C. Penney Co.* (1985) 173 Cal.App.3d 713, 718-719 [219 Cal.Rptr. 272].) "Where, as here, successive proceedings are different in nature, one criminal and one civil, collateral estoppel may still bar relitigation of issues decided in the first action." (*Mueller* v. *J. C. Penney Co., supra,* 173 Cal.App.3d at p. 719.) For example, where the previous criminal prosecution resulted in a conviction, collateral estoppel may well apply in the later civil cases to issues determined in the prior criminal case. (*Teitelbaum Furs, Inc.* v. *Dominion Ins. Co., Ltd.* (1962) 58 Cal.2d 601, 604-607 [25 Cal.Rptr. 559, 375 P.2d 439].)[7] However, in light of the difference in the burden of proof in criminal and civil cases, an acquittal in the criminal proceeding will preclude application of collateral estoppel in the later civil case. (*In re Anderson* (1951) 107 Cal.App.2d 670, 672 [237 Cal.Rptr. 720].)

---

[7]There is authority for the proposition the doctrine of collateral estoppel does not apply to judgments involving misdemeanor convictions. (See *Manes* v. *Wiggins* (1967) 247 Cal.App.2d 756, 758 [56 Cal.Rptr. 120]; 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, § 237, pp. 674-675; but see *Mueller* v. *J. C. Penney Co., supra,* 173 Cal.App.3d at pp. 719-722, fn. 8.)

In any event, where a question of law essential to a judgment is actually litigated and resolved by a valid and final judgment, that determination will not collaterally estop the parties in a later action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction and no injustice would result. (*City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 230 [123 Cal.Rptr. 1, 537 P.2d 1250]; see *Pacific Maritime Assn.* v. *California Unemp. Ins. Appeals Board* (1965) 236 Cal.App.2d 325, 334 [45 Cal.Rptr. 892]; 7 Witkin, Cal. Procedure, *supra,* Judgment, § 274, p. 714.) In other words, although such a judgment may be given conclusive effect as to a question of law raised in a later action where both causes of action have as their genesis the same subject matter or transaction, the doctrine may not be applied where injustice would result either because of the effect upon third persons or that the public interest requires full litigation. (*Moore* v. *Panish* (1982) 32 Cal.3d 535, 540, fn. 5 [186 Cal.Rptr. 475, 652 P.2d 32]; *City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d at p. 230; *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749, 757-758 [22 Cal.Rptr. 14, 371 P.2d 758].)

Even assuming arguendo, the appellate department resolved this issue of the constitutionality of section 1603 in reversing Rutherford's conviction, the trial court's refusal to apply the doctrine of issue preclusion is justified as to this predominately legal issue where a new determination is warranted in order to avoid the inequitable administration of the laws (Rest.2d, Judgments, § 28(2); *Katz* v. *State Tax Assessor* (Me. 1984) 472 A.2d 428, 431, fn. 3; *City of Plainfield* v. *Public Service, Etc.* (1980) 82 N.J. 245 [412 A.2d 759, 766]; *Marsland* v. *Int. Soc. For Krishna Consc.* (1983) 66 Hawaii 119 [657 P.2d 1035, 1039]; *Young* v. *Edwards* (1973) 389 Mich. 333 [207 N.W.2d 126, 127]), and the inevitably adverse impact upon the public interest which itself demonstrates a convincing need for a new determination of the issue (*City of Plainfield* v. *Public Service, Etc., supra,* 412 A.2d at p. 766; see *Moore* v. *Panish, supra,* 32 Cal.3d at p. 540, fn. 5; *City of Los Angeles* v. *City of San Fernando, supra,* 14 Cal.3d at p. 230).[8]

As to the former consideration, a reexamination of the constitutionality of section 1603 is appropriate because under the circumstances " 'preclusion would result in a manifestly inequitable administration of the laws.' "

---

[8]The Restatement Second of Judgments section 28 pertinently provides: "Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances: ... [¶] (2) The issue is one of law and ... (b) a new determination is warranted in order to ... avoid inequitable administration of the laws; or [¶] ... [¶] ... [¶] (5) There is a clear and convincing need for a new determination of the issue (a) because of the potential adverse impact of the determination on the public interest or the interests of persons not themselves parties in the initial action, ..."

(*Marsland* v. *Int. Soc. For Krishna Consc., supra,* 657 P.2d at p. 1039, quoting com. C to Rest.2d Judgments, § 28.) ▉▉▉ Comment C to section 28(2) of the Restatement Second of Judgments restates this proposition as follows: "[T]he choice must be made in terms of the importance of stability in the legal relationships between the immediate parties, the actual likelihood that there are similarly situated persons who are subject to application of the rule in question, and the consequences to the latter if they are subject to different legal treatment. In this connection it can be particularly significant that one of the parties is a governmental agency responsibile for continuing administration of a body of law that affects members of the public generally, as in the case of tax law. Refusal of preclusion is ordinarily justified if the effect of applying preclusion is to give one person a favored position in current administration of a law." (Accord *Katz* v. *State Tax Assessor, supra,* 472 A.2d at p. 431, fn. 3.)

▉▉▉ The Department here, in carrying out its responsibilities for the administration of the fish and game laws, is presumably applying section 1603 to all other persons. Consequently, Rutherford currently enjoys a favored position to the disadvantage of other persons similarly situated. Disparate application of the law justifies refusal to preclude reconsideration of the issue in this case. (*Id.* at p. 431, fn. 3; *Marsland* v. *Int. Soc. For Krishna Consc., supra,* 657 P.2d at p. 1039; *City of Plainfield* v. *Public Service, Etc., supra,* 412 A.2d at p. 766.) Indeed, "[j]udicial resolution of the instant dispute requires a court to announce a rule of law which will apply to persons other than the litigants here. The rule might well be challenged in the future. It would not be fair, under these circumstances, for us to prevent these parties from litigating the merits of the issue because of a prior judgment between them. [Citation.]" (*Moore* v. *Panish, supra,* 32 Cal.3d at p. 540, fn. 5.)

Further, the inevitable adverse impact on the public interest itself demonstrates a convincing need for a redetermination of this issue in light of the special status of the Department as an administrative governmental entity responsible for enforcing section 1603 and its underlying legislative purpose to benefit the broader interest of the public in fish and game conservation. (See *City of Plainfield* v. *Public Service, Etc., supra,* 412 A.2d at p. 766.)[9]

---

[9]Moreover, we find the reasoning of the court in *Tar Land. Villas Owners' Ass'n* v. *Atl. Beach* (1983) 64 N.C. App. 239 [307 S.E.2d 181, 185-186], persuasive and compelling here: "The doctrine of collateral estoppel may be applied regardless of whether the issue involves questions of fact or law. [Citations.] When the issue, however, as in this case, involves the scope and formulation of a law never before addressed by an appellate court in this State, we believe that our duty to develop the law outweighs the resulting burden on petitioners.

" '[T]he policy supporting issue preclusion is not so unyielding that it must invariably be applied, even in the face of strong competing considerations. There are instances in which the interests supporting a new determination of an issue already determined outweigh the resulting burden on the other party and the courts.'

However, we believe there exists a more basic reason for not applying the doctrine of collateral estoppel here, to wit: the absence of any guaranty the appellate department actually resolved the issue of the constitutionality of section 1603. ▊ Although an appellate court in affirming a judgment against an appellant without opinion must be presumed to have found adversely to appellant on *all* questions presented by the latter's brief (*Bridenbaker* v. *Kissell* (1928) 131 Misc. 534 [227 N.Y.S. 384, 391]), the same completeness in resolution is not a logical consequence where a prevailing appellant obtains a reversal on appeal without opinion in a criminal matter where multiple issues are presented to the appellate tribunal. ▊ An analogous situation within the civil context is where a judgment is based upon a general verdict in an action where a determination of any one of several issues presented may have formed the basis for that verdict, which does not permit the application of the doctrine of collateral estoppel to issues in a later action under circumstances where it is necessary to identify the specific issue adjudicated in the original action. (*Stout* v. *Pearson* (1960) 180 Cal.App.2d 211, 216 [4 Cal.Rptr. 313].) Similarly here, because the appellate department failed to support its decision with an opinion specifically designating its grounds for reversal of the conviction and instead left a silent record leaving to conjecture what was necessarily involved and decided, it is not just to apply the doctrine of collateral estoppel. Indeed, it is possible and within the power of the appellate department to have based its decision on omissions not addressed by the parties in their appellate briefing. In summary, under these circumstances, the constitutionality of an important statutory provision cannot be left to conjecture and surmise as to the theoretically possible mental processes of the members of the appellate department panel. (See generally, *People* v. *Medina* (1972) 6 Cal.3d 484 [99 Cal.Rptr. 630, 492 P.2d 686].)

### THE TRIAL COURT DID NOT ERR IN FAILING TO FIND A DAMAGING OR TAKING OF RUTHERFORD'S PROPERTY IN VIOLATION OF CALIFORNIA CONSTITUTION, ARTICLE I, SECTION 19

▊ Rutherford meritlessly contends the Department's conduct here constituted an unlawful taking or damaging of his property, because "[n]ot

---

"[Citation.] We find the policy considerations in the Restatement of Judgements against applying the doctrine when the issue concerns a fresh determination of the law to be persuasive.

" '[The] function of developing the law ... is especially pertinent when there is a difference in forums in which the two actions are to be determined, as when the issue was determined in the first action by a trial court and in the second action will probably be taken to an appellate court ... [or] when the issue is of general interest and has not been resolved by the highest appellate court that can resolve it ... [I]t is also pertinent that the party against whom the rule of preclusion is to be applied is a government agency responsible for continuing administration of a body of law applicable to many similarly situated persons."

only [was] there a physical invasion of his property," but he also was "deprived of substantially all use of [his] property [due to] the huge washouts that occurred when [the Department] halted the work causing the destruction of his property and construction work." In other words, he apparently contends that regardless of whether he was required to obtain a section 1603 permit and refused to do so and thus could not complete the construction project he had already commenced, his property was taken by governmental inverse condemnation. However, the appropriate remedy for a property owner to object to permit requirements is a proceeding in mandamus. (Code Civ. Proc., § 1094.5; *Pfeiffer* v. *City of La Mesa* (1977) 69 Cal.App.3d 74, 77 [137 Cal.Rptr. 804].) Moreover, Rutherford's failure to even attempt to obtain the required section 1603 permit by notifying the Department precludes him from bringing an inverse condemnation action. For "[i]t is established that landowners have no vested right in any particular use of their property unless the restrictions on use constitute an uncompensated taking. [Citations.] A landowner's right to develop his property vests only when he has obtained government permission for the particular mode of development and has begun such development in good faith reliance thereon. [Citation.] Zoning of land is not a 'taking' by the government unless it deprives the owner of substantially all reasonable uses of his property. [Citation.] Indeed, it has been flatly held that '[c]ases involving land use regulation do not affect fundamental vested rights. [Citations.]' (*Krater* v. *City of Los Angeles* (1982) 130 Cal.App.3d 839, 844 [181 Cal.Rptr. 923].) "Thus, it must be concluded that government power to regulate land use is so important that no vested right to a particular use arises until the government has approved that specific use." (*Pescosolido* v. *Smith* (1983) 142 Cal.App.3d 964, 969-970 [191 Cal.Rptr. 415].)

Accordingly, absent a vested right to use his land as contemplated in the challenged remedial project, Rutherford cannot bring an inverse condemnation action.

### THE TRIAL COURT DID NOT ERR IN FAILING TO FIND RUTHERFORD'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS HAD BEEN VIOLATED

 Relying on 42 United States Code section 1983,[10] Rutherford asserts the Department and its agents denied his civil rights by taking and damaging his property and interfering with his liberty to use that property

---

[10]Section 1983 of title 42 of the United States Code provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory. . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

without due process of law under the color of section 1603. In other words, he contends the Department enforced section 1603 as a pretext to punish him for exercising his right to use and enjoy his real property.

The burden upon a plaintiff in a 42 United States Code section 1983 claim is to not only allege, but also prove, the denial of some right, privilege or immunity secured by the Constitution or laws of the United States by someone acting under color of state law. (*Kao* v. *Red Lion Municipal Authority* (M.D. Pa. 1974) 381 F.Supp. 1163, 1165.) Plaintiff must establish: (1) the challenged conduct was committed by a person purporting to act under state law; and (2) this conduct deprived him/her of rights, privileges or immunities secured by the Constitution or laws of the United States. (*Shaw* v. *Neece* (10th Cir. 1984) 727 F.2d 947, 949; *Augustine* v. *Doe* (5th Cir. 1984) 740 F.2d 322, 324-325; *Chiplin Enterprises* v. *City of Lebanon* (1st Cir. 1983) 712 F.2d 1524, 1526-1527; *Hayssen* v. *Board of Zoning Adjustments* (1985) 171 Cal.App.3d 400, 409 [217 Cal.Rptr. 464].)[11]

Although the language of 42 United States Code section 1983 is broad, it was never intended to turn every defeat or denial of a claimed state right into a federal right with a federal remedy. (*Bradford Audio Corporation* v. *Pious* (2d Cir. 1968) 392 F.2d 67, 72.) Indeed, it is firmly established 42 United States Code section 1983 does not create substantive rights, but rather provides a remedy for violations of rights secured by federal and constitutional law. (*Irby* v. *Sullivan* (5th Cir. 1984) 737 F.2d 1418, 1427; *Wise* v. *Bravo* (10th Cir. 1981) 666 F.2d 1328, 1331; *Hayssen* v. *Board of Zoning Adjustments, supra,* 171 Cal.App.3d at p. 409.)

Although the first requirement is met here, Rutherford has not been deprived of any constitutional right. There is no due process violation because we find the statute both facially constitutional and constitutionally applied. Just as a real estate developer alleging a governmental entity refused to issue a building permit for a real estate project even though reasonable requirements had been met has been held not deprived of any constitutional right (*Chiplin Enterprises* v. *City of Lebanon, supra,* 712 F.2d at p. 1527), requiring Rutherford to apply for and obtain a section 1603 permit under these circumstances provides no basis for a 42 United States Code section 1983 action. "[I]t is axiomatic that not every violation of a state statute amounts to an infringement of constitutional rights. [Citation.] The courts have rejected similar attempts to create a constitutional question out of a state law violation in the area. [Citations.]" (*Ibid.*)

---

[11]"While section 1983 asserts a federal cause of action, the United States Supreme Court has clearly recognized that a state court can exercise jurisdiction over a section 1983 claim. [Citation.]" (*Hayssen* v. *Board of Zoning Adjustments, supra,* 171 Cal.App.3d at p. 409.)

Consequently, even if the Department wardens' actions had been (and there is no evidence of this) improperly motivated, absent an allegation and substantiation of the deprivation of a specific constitutional right, Rutherford raises simply a matter of local concern properly and fully governed by those remedies available from state courts. (*Ibid.*)

 Relying on *Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 390-397 [29 L.Ed.2d 619, 623-627, 91 S.Ct. 1999], the parties agree a cause of action for damages can be inferred from the Fifth Amendment by virtue of the Fourteenth Amendment for the taking of property without due process of law and without just compensation. Although the *Bivens* decision involved the Fourth Amendment, courts have held that this remedy resting on the Fourteenth Amendment is not confined to the Fourth Amendment, and specifically applies to the Fifth Amendment. (See *United States* ex rel. *Moore* v. *Koelzer* (3rd Cir. 1972) 457 F.2d 892, 894; *6th Camden Corp.* v. *Evesham Tp., Burlington Cty.* (D.N.J. 1976) 420 F.Supp. 709, 716.)

Now, although this claim under the Fourteenth Amendment is separate and distinct from a 42 United States Code section 1983 action, it still ultimately derives from the same constitutional source.[12] Consequently, the law developed under section 1983 litigation may be correctly applied to a *Bivens*-type action, "to fill the doctrinal interstices." (*6th Camden Corp.* v. *Evesham Tp., Burlington Cty., supra,* 420 F. Supp. at p. 717.) Within the 42 United States Code section 1983 context, the Fish and Game officers whose conduct is at issue here cannot be held liable under the Civil Rights Act where there is no showing they acted abusively and maliciously to derogate Rutherford's constitutional rights. (*Prochaska* v. *Marcoux* (10th Cir. 1980) 632 F.2d 848, 851-853.) Moreover, they cannot be held liable for their enforcing section 1603 absent a showing of bad faith or lack of reasonable cause to inspect and follow through. (*Hanna* v. *Drobnick* (6th Cir. 1975) 514 F.2d 393, 397-398.)[13] Accordingly, just as in the 42 United States Code section 1983 action, the wardens here are clothed with the same defenses of good faith and reasonable grounds for their conduct.

---

[12] In fact, within this context, it simply duplicates the 42 United States Code section 1983 claim.

[13] An allegation of bad faith or arbitrary and capricious conduct constitutes no more than an allegation of an abuse of discretion by those officials responsible for carrying out a law "and does not rise to the level of a constitutional deprivation, although it may be a violation of state law. To be sure, a violation of state law that deprives an individual of a property right may violate the Due Process Clause. [Citation.] But, a 'mere bad faith refusal to follow state law in . . . local administrative matters simply does not amount to a deprivation of due process where the state courts are available to correct the error.'" (Fns. omitted.) (*Pastan* v. *City of Melrose* (D.C. Mass. 1985) 601 F.Supp. 201, 204, quoting *Chiplin Enterprises* v. *City of Lebanon, supra,* 712 F.2d at p. 1528.)

The record lacks any evidence revealing malicious, abusive or bad faith enforcement of section 1603 on the part of the Department and its employees. The record overwhelmingly shows the Department had reasonable cause to inspect Rutherford's project and pursue enforcement of section 1603. Moreover, they acted with an abundance of accommodation and consideration in light of a statute which had never been held unconstitutional. ██ ██ There is no showing of bad faith in enforcing section 1603 and, in light of the reasonableness of their conduct, the Department and its agents are free from liability under either a *Bivens*-type action or a 42 United States Code section 1983 claim.[14]

DISPOSITION

Judgment affirmed.

Kremer, P. J., and Lewis, J., concurred.

---

[14]Even if we held the provision to be unconstitutional, Government Code section 820.6 would clothe the wardens with immunity. Section 820.6 provides: "If a public employee acts in good faith, without malice, and under the apparent authority of an enactment that is unconstitutional, invalid or inapplicable, he is not liable for an injury caused thereby except to the extent that he would have been liable had the enactment been constitutional, valid and applicable." This employee immunity inures to the benefit of the employing agency under Government Code section 815.2, subdivision (b). Again, absent any evidence at trial demonstrating malice or bad faith, the Department and its agents are immune from liability. With regard to Rutherford's contention the wardens acted without probable cause, we note they are entitled to enter onto private open fields to enforce fish and game laws because such sites are regarded as so public in nature that inspections are justifiable without any particular showing of cause or exigency. (*Betchart* v. *Department of Fish & Game* (1984) 158 Cal.App.3d 1104, 1110 [205 Cal.Rptr. 135].) However, here the wardens had ample cause.