[No. C042750. Third Dist. Mar. 8, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILLIP WRIGHT OSBORN, Defendant and Appellant.

COUNSEL

William Cushman for Defendant and Appellant.

R. Dabney Eastham for The New 49'ers, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Peter E. Von Haam, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**DAVIS, J.**—This is a civil action under Fish and Game Code section 5653 et seq. and former Fish and Game Code section 1603 involving suction dredging into the bank of a stream.[1] Section 5653 et seq. is the principal statutory scheme that governs suction dredging. One of the regulations adopted pursuant to this statutory scheme prohibits "suction dredg[ing] into the bank of any stream, river, or lake." (Cal. Code Regs., tit. 14, § 228, subd. (f)(2); § 5653.9.)[2] Former section 1603 provided, in part, that "[i]t is unlawful for any person to . . . substantially change the . . . bank of any . . . [designated] stream" without first notifying the Department of Fish and Game (the Department). (Former § 1603, subd. (a).)[3] Here the Department, pursuant to Regulation 228, subdivision (f)(2), cited the defendant, Phillip Osborn, for suction dredging into the bank of the Klamath River.[4] Based on that citation, the People then sued Osborn under former section 1603 for substantially changing the bank without notice.

In this appeal, we interpret the term "bank"—as applied to the activity of suction dredging in a stream as governed by these statutes and Regulation 228, subdivision (f)(2)—in its ordinary sense: the slope or elevation of land

---

[1] Future undesignated statutory references are to the Fish and Game Code. Section 1603 was repealed by Statutes 2003, chapter 736, section 1. The substantive provisions of former section 1603 are now found in section 1602, which was added by Statutes 2003, chapter 736, section 2.

[2] Sections 228 and 228.5 of title 14 of the California Code of Regulations are the relevant regulations here. They will be referred to as Regulation 228 and Regulation 228.5.

[3] Section 1602, enacted in 2003; see fn. 1, *ante*) provides in part that "[a]n entity [which includes a person; see § 1601, subd. (d)] may not . . . substantially change . . . the . . . bank of[] any river, stream, or lake" without notifying the Department (§ 1602, subd. (a)). Section 1602, subdivision (c) further provides that "[i]t is unlawful for any person to violate this section."

[4] Paragraph 9 of the complaint alleges that the Klamath River is a "stream" as that term is used in former section 1603.

that bounds the bed of the stream in a permanent or long-standing way, and that confines the stream water up to its highest level. (See §§ 1603, 5653; Reg. 228, subd. (f)(2).) In arriving at this interpretation, we conclude that section 5653.5—which defines "river, stream, or lake" for purposes of section 5653—does not exclusively govern where suction dredging may take place once it is allowed in any particular river, stream or lake. In light of our interpretation of the term "bank," we affirm the judgment that enjoined and fined Osborn. (Former § 1603.1; now see § 1615.)

## BACKGROUND

As defined by regulation, suction dredging, also called vacuum dredging, is the use of a suction system to remove and return material at the bottom of a river, stream, or lake for the extraction of minerals, primarily gold. (Reg. 228, first par.) Recreational suction dredging represents 90 percent of all suction dredging.[5]

Suction dredges usually consist of an engine and pump that can be floated on a makeshift raft, an intake line to supply the pump with water, and a high-pressure line attached from the pump to a submerged intake nozzle. Water from the high-pressure line is introduced into the submerged part of the dredge (operated by someone with underwater air tanks) and directed backwards to create a powerful suction at the nozzle. Sand, gravel, and rocks from the river, stream or lake bottom are drawn through the intake nozzle to a riffle box and then out the rear of the dredge as "tailings."

In 1961, the Legislature adopted section 5653 to govern suction dredging. (Stats. 1961, ch. 1816, § 1, p. 3864.) Following the enactment of section 5653, the Department "informally regulated" suction dredging for about three decades. In 1994, pursuant to authority granted under section 5653.9, the Department adopted formal regulations to carry out section 5653: Regulations 228 and 228.5.

Regulation 228, subdivision (f), sets forth certain restrictions regarding suction dredging. Among these restrictions is that "[n]o person may suction dredge into the bank of any stream, lake or river." (Reg. 228, subd. (f)(2).) Regulation 228, subdivision (f), also states that operating outside these specified restrictions "may require compliance with Fish and Game Code sections 1600–1607, which govern lake and streambed alterations."

---

[5] We grant the request of amicus curiae, The New 49'ers, Inc. (The New 49'ers), to judicially notice the Final Environmental Impact Report for the Adoption of Regulations for Suction Dredge Mining, issued by the state Department of Fish and Game on April 1, 1994. (Evid. Code, §§ 452, subd. (c), 459, subd. (a).)

Former section 1603, subdivision (a), stated in pertinent part that "[i]t is unlawful for any person to . . . substantially change the bed, channel, or bank of any river, stream, or lake designated by the [D]epartment, or use any material from the streambeds, without first notifying the [D]epartment of that activity . . . ."

The Department cited Osborn for violating Regulation 228, subdivision (f)(2) (suction dredging into the bank of the Klamath River). Based on this citation, the People brought a civil action against him under former section 1603. As part of its action, the People also sued Osborn for an unlawful business practice under Business and Professions Code section 17200, but this count was dismissed be cause Osborn was not acting in a business capacity during his suction dredging.

The trial court concluded that Osborn had violated former section 1603 by dredging into the bank (while it was under water), without first notifying the Department. The trial court defined "bank" as "the area that confines the lateral movement of the stream," adding that the "water level is not relevant" to this definition. The trial court enjoined Osborn from doing such dredging without notifying the Department and imposed a $3,500 civil penalty against him. (Former § 1603.1.) This appeal ensued.

## Discussion

The relevant facts are undisputed, including the location of Osborn's suction dredging, which took place under the water near the edge of the waterway. The question is the legality of that suction dredging. That question requires us to interpret certain statutes and regulations.

"Our objective in interpreting a statute is to determine legislative intent so as to effectuate the law's purpose. The first thing we do is read the statute, and give the words their ordinary meanings unless special definitions are provided. If the meaning of the words is clear, then the language controls; if not, we may use various interpretive aids." (*Schnyder v. State Bd. of Equalization* (2002) 101 Cal.App.4th 538, 545 [124 Cal.Rptr.2d 571], fns. omitted.)

Initially, we face the threshold issues of whether former section 1603 plays any role here, or whether the section 5653 statutory scheme, as Osborn maintains, exclusively governs suction dredging, including specifying where suction dredging is allowed.

■ Indisputably, section 5653 et seq. is the principal statutory scheme on suction dredging. Section 5653 sets forth the governing theme, stating in relevant part: "(a) The use of any vacuum or suction dredge equipment by any person in any river, stream, or lake of this state is prohibited, except as authorized under a permit issued to that person by the [D]epartment in compliance with the regulations adopted pursuant to Section 5653.9. . . . [¶] (b) Under the regulations adopted pursuant to Section 5653.9, the [D]epartment shall designate waters or areas wherein vacuum or suction dredges may be used pursuant to a permit, waters or areas closed to those dredges, the maximum size of those dredges that may be used, and the time of year when those dredges may be used. If the [D]epartment determines, pursuant to the regulations adopted pursuant to Section 5653.9, that the operation will not be deleterious to fish, it shall issue a permit to the applicant." Another statute in the section 5653 et seq. scheme, section 5653.7, authorizes the closing of dredging areas "when necessary to protect fish and wildlife resources."

The regulations on suction dredging specify requirements regarding permits and equipment, as well as restrictions regarding methods, places and times of operation. (Regs. 228, 228.5.)

■ Former section 1603 did not specifically mention suction dredging but made it unlawful to substantially divert the flow or to substantially change the bed, channel, or bank of any Department-designated river, stream, or lake, or to use any material from the streambeds, without first notifying the Department of that activity. (Former § 1603, subd. (a).) The statute's purpose was to protect fish and wildlife resources. (*Ibid.*; now see § 1602.)

Osborn argues that section 5653.5 exclusively governs where suction dredging may take place once such dredging is allowed in any particular river, stream or lake. Section 5653.5 states that, "[f]or purposes of Section 5653, 'river, stream, or lake' means the body of water at the current water level at the time of the dredging." Osborn asserts that since it is undisputed that he was suction dredging in a stream under the current water level at the time of the dredging and he had a valid permit, that is the end of the matter—he was acting legally.

■ The problem with this argument is that Osborn sees section 5653.5 as an end when it is really just a beginning. Section 5653.5 states, in *general* terms only, where suction dredging may take place if it is allowed at all: under the current water level at the time of the dredging. Section 5653.5 recognizes the nature of suction dredging, which takes place under water, and recognizes that water levels in bodies of water where suction dredging is

allowed may change suddenly and unexpectedly. (See, e.g., § 5653.7 [authorization to close dredging areas upon unanticipated water level change].)

■ Furthermore, section 5653.5 defines " 'river, stream, or lake' " "[f]or purposes of Section 5653." Section 5653 prohibits suction dredging "in any river, stream, or lake" in California—meaning suction dredging is generally prohibited as to those water bodies at their current water levels—"except as authorized under a permit issued . . . by the [D]epartment in compliance" with the Regulations. (§§ 5653, subd. (a), 5653.5.) Section 5653 adds that the regulations "shall designate waters or areas wherein . . . suction dredges may be used pursuant to a permit, [and] waters or areas closed to those dredges[.]" (§ 5653, subd. (b).) The relevant regulations *"define"* suction dredging "as the use of a suction system to remove and return material *at the bottom* of a stream, river, or lake for the extraction of minerals," and prohibit suction dredging *"into the bank* of any stream, lake or river." (Reg. 228, first par. & subd. (f)(2), italics added.) These regulations, which are an integral part of the section 5653 et seq. governing scheme, more specifically delineate the location of suction dredging than does section 5653.5. (See also § 5653.9 ["[t]he [D]epartment shall adopt regulations to carry out Section 5653"].)

■ We conclude that section 5653.5 does not exclusively govern where suction dredging may take place in a river, stream or lake. In parallel fashion, the section 5653 et seq. statutory scheme does not exclusively govern the general subject of suction dredging. There is room for other relevant laws.

One of these other relevant laws is former section 1603. Former section 1603 outlawed, among other things, "substantially chang[ing] the bed, channel, or bank of any [Department-designated] river, stream, or lake . . . , or us[ing] any material from the streambeds, without first notifying the [D]epartment of that activity[.]" The purpose of this notice is so the Department can ensure that fish and wildlife resources are protected. Similarly, the section 5653 statutory scheme calls upon the Department to protect these same resources in rivers, streams, or lakes through a notice (permit application) process. (See §§ 5653, subds. (a), (b), 5653.7.) Regulation 228, subdivision (f)(2), moreover, incorporates former section 1603 by stating that "[o]perating outside [the regulatory] Restrictions . . . may require compliance with Fish and Game Code sections 1600–1607, which govern lake and streambed alterations." It is clear that former section 1603 played a role in the suction dredging realm; in fact, one can bank on it.

■ Osborn claims, however, that former section 1603 is not relevant because suction dredging is, by definition, a violation of former section 1603. That is

not true. Former section 1603 prohibited a person from substantially diverting the flow of, or substantially changing a watercourse's bed, channel or bank, or using streambed material, without first notifying the Department of that activity; this was (and is) to protect fish and wildlife. The Department's application process under section 5653 et seq. for a suction dredge permit would encompass such notice and cover these concerns. (See § 5653, subds. (a), (b) ["(a) . . . person shall submit an application for a permit for a vacuum or suction dredge to the [D]epartment, specifying the type and size of equipment to be used and other information as the [D]epartment may require"; "(b) . . . If the [D]epartment determines . . . that the operation will not be deleterious to fish, it shall issue a permit to the applicant"]; see also 5653.9; Reg. 228.)

Predictably, Osborn then points to his valid suction dredge permit, claiming that it required him to notify the Department of his intent and therefore immunizes him against a former section 1603 violation. But this is not true either. In his suction dredge permit application, Osborn did not state his intent to suction dredge into the bank of a stream. The permit application form, furthermore, states that the "permittee shall comply with all applicable federal, state and local laws," and that "[s]uction or vacuum dredges shall not be used where dredging is prohibited by such laws." A valid permit would not immunize a permittee who acted outside the scope of the permit by unlawfully dredging into a bank, for example.

That covers the threshold issue of whether former section 1603 applies here—it does; and the threshold issue of whether section 5653.5 exclusively governs the location of suction dredging in a river, stream or lake—it does not. The previous analysis also dispenses with Osborn's claims that (1) by obtaining a suction dredge permit he "has a right to depend upon the language of section 5653 as the law," and (2) the only allowable punishment for violating Regulations 228 or 228.5 is the misdemeanor punishment provided under section 5653, subdivision (b), and therefore the Department could not bring a civil action against him under former section 1603, subdivision (a).

Having resolved these threshold issues, we turn to the legal question of whether Osborn's undisputed suction dredging activity violated former section 1603 and Regulation 228, subdivision (f)(2), by dredging into the "bank" of the stream. This question requires us to interpret the term "bank" in the context of suction dredging in a stream. As noted, the Department cited Osborn under Regulation 228, subdivision (f)(2), for "suction dredg[ing] into the bank of [a stream]." Based on that citation, the People then sued

Osborn under former section 1603, subdivision (a), for "substantially chang-[ing] the . . . bank of the Klamath River [a designated stream]" without notice. (This appeal does not involve any issue as to whether Osborn *"substantially change[d]"* the bank of a stream under former section 1603, subdivision (a).)

■ As noted previously, in interpreting a law, the first thing we do is read it and give the words their ordinary meanings unless special definitions are provided. (*Schnyder v. State Bd. of Equalization, supra,* 101 Cal.App.4th at p. 545.) No special definitions are provided here. ■ The ordinary meaning of a "bank" of a stream is the slope or elevation of land that bounds the bed of a stream in a permanent or long-standing sense, and that confines the stream water up to its highest level. This definition aligns with common knowledge, common dictionaries and legal dictionaries. (See, e.g., American Heritage Dict. (2d college ed. 1982) p. 156 ["[t]he slope of land adjoining a body of water"]; Black's Law Dict. (5th ed. 1979) p. 132 ["[a]n acclivity [an upward slope]; . . . especially that which borders the sides of a water course"; "[t]he elevation of land which confines the waters of a stream in their natural channel when they rise the highest and do not overflow the banks. A water-washed and relatively permanent elevation or acclivity at the outer line of a river bed which separates the bed from the adjacent upland"; "[a]n elevation of land which confines the waters of a stream when they rise out of the bed"].)

Lest there be any doubt about this interpretation, it is also confirmed, first, by case law, second, by the relevant regulations, and third, by the 1994 Final Environmental Impact Report (FEIR) that was used as a basis to adopt those regulations. We discuss these in turn.

First, case law has defined generally the terms "bed" and "bank" in various watercourse contexts. In construing a deed that mentioned a river bank, this court, in *Mammoth Gold Dredging Co. v. Forbes* (1940) 39 Cal.App.2d 739, 751 [104 P.2d 131], stated that "the bed of a nonnavigable river must be deemed to be bounded by the permanent banks which confine the waters in their course at their highest level . . . . That definition is peculiarly applicable to those California rivers which depend upon periodical supply of water from winter rains and melted snow, and which diminish in the summer time to mere rivulets which aimlessly wander about over dry gravel beds." (Accord, *Ventura Land etc. Co. v. Meiners* (1902) 136 Cal. 284, 290–291 [68 P. 818].) And in rejecting a vagueness challenge to former section 1603, the court in *Rutherford v. State of California* (1987) 188 Cal.App.3d 1267, 1279–1280 [233 Cal.Rptr. 781], stated that "a streambed is commonly understood as '. . . the depression between the banks worn by the regular and usual flow of the water.' "

Second, the regulations define suction dredging as "the use of a suction system to remove and return material *at the bottom* of a stream, river, or lake for the extraction of minerals." (Reg. 228, italics added.) The regulations prohibit "suction dredg[ing] *into the bank* of any stream, lake or river," removing or damaging "woody riparian vegetation" and "woody streamside vegetation," and moving any "anchored, exposed woody debris such as root wads, stumps or logs." (Reg. 228, subd. (f)(2), (3), (1)(E), & (4), respectively, italics added.) As the trial court perceptively observed, it would make no sense for the regulations to refer to the "bottom" of a stream if they or their authorizing legislation (i.e., § 5653 et seq., see § 5653.5) "meant that dredging could take place anywhere in the water." Apparently, the reference to "bottom" is a general way of referring to "bed."

■   Furthermore, the regulations distinguish between the "bottom" of a stream, where suction dredging is allowed, and the "bank" of a stream, where such dredging is prohibited. Since suction dredging, by its nature, takes place only under water, the prohibition on suction dredging into the bank must mean that part of a bank can be under water (i.e., the sloped land between the edge of the waterway and the boundary of the bed). Osborn's expert at trial, David McCracken, supported this view. McCracken distinguished between "high banking," which refers to mining the dry bank and is not suction dredging, and "dredging into the bank," which refers to widening the stream through suction dredging and is covered by the regulation prohibiting such. And the regulations' concern for protecting riparian vegetation is also a concern for protecting banks, where such vegetation largely resides.

Third, the FEIR notes that "[s]tream banks can be significantly affected by undermining of *the banks below the water line* causing bank sloughing and failure [citation]. This adversely affects stream bank structure and stability, riparian vegetation, and thus animal species dependent upon those habitat types . . . . The condition of the stream bank and riparian zone is closely linked to the stability of the channel and the quality of fish habitat." (Italics added.) The FEIR concludes that "[i]mpacts to the banks and channels of streams, rivers and the riparian habitat from suction dredging can be significantly adverse. Damage to these resources take natural processes a long time to repair. Impacts to the streambed and substrate are generally short term . . . . In most cases impacts to the streambed and substrate from suction dredging are not evident after one year."

The FEIR, then, recognizes that banks may exist or continue below the water line, and that suction dredging may undermine that part of a bank and cause significant adverse environmental effects through bank sloughing and

failure. The FEIR also recognizes that suction dredging into beds is much less environmentally harmful than dredging into banks; hence, the regulations define suction dredging as taking place in the "bottom" of the stream, while prohibiting it from being done into the "bank."

Osborn and the amicus curiae, The New 49'ers, dispute our interpretation of "bank." Osborn defines the term as the sloped land above the water level and a vertical line below the water level starting at the edge of the waterway. This definition is incongruent with the nature of a bank as sloped land, and is not any clearer than the one we have adopted. Furthermore, Osborn's expert at trial, McCracken, testified that defining a bank is not this simple in light of bank sloughing and failure.

The New 49'ers suggests the following definition for "bank," which it claims is supported by the ordinary meaning of words, the regulations, the FEIR, and section 5653.5 (which states, "[f]or purposes of Section 5653, 'river, stream, or lake' means the body of water at the current water level at the time of the dredging"): "Bank" means "where the edge of the waterway meets the dry land 'at the time of dredging.' " This suggestion restricts the definition of bank to dry land, and allows suction dredging anywhere below the then-existing water line. As The New 49'ers argues, "to 'suction dredge into the bank' of a river is to operate a suction dredge so as to undermine the material that is above the existing waterline (the 'bank') so as to cause this material to slough into the waterway."

Our previous analysis has shown why the ordinary meaning of words, the regulations, the FEIR and section 5653.5 run counter to this view of the term "bank." It bears repeating that the FEIR, which was used as the basis to adopt Regulation 228, subdivision (f)(2), prohibiting "suction dredg[ing] into the bank of [a] . . . river," states that "[s]tream banks can be significantly affected *by undermining of the banks below the water line* causing bank sloughing and failure." (Italics added.) Under The New 49'ers' definition, moreover, the bank would logically "disappear" precisely at the moment when it was most needed—when a river was full. In short, The New 49'ers' definition of "bank" does not hold water, and that is its downfall.

The New 49'ers also contends that our interpretation is ambiguous because some banks rise slowly and it is sometimes unclear where the "bed" ends and the "bank" begins. That may be true in some instances, but the nature of stream morphology does not allow any greater precision. Furthermore, defining "bank" as the slope or elevation of land that bounds the bed in a permanent or long-standing way, and that confines the water up to its highest

level, should help clarify matters in this regard. In any event, here there was no dispute that Osborn was suction dredging into a relatively steep bank just below the water line. (Neither Osborn nor The New 49'ers has raised any claim that the term "bank" is unconstitutionally vague; nor could they successfully have done so in light of its ordinary meaning [see *Rutherford v. State of California, supra,* 188 Cal.App.3d at pp. 1276–1280].)

### DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Hull, J., concurred.

Petitions for a rehearing were denied April 2, 2004, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 9, 2004.